# UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---
14-1263
---

*AQUA SHIELD,*

Plaintiff-Appellant

v.

*INTERPOOL POOL COVER TEAM, ALUKOZ HZ SPOL SRO, ALUKOV SPOL SRO, POOL & SPA ENCLOSURES*

Defendants-Appellees

---
APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH IN CASE NO. 2:09-CV-00013
---

# CORRECTED BRIEF OF PLAINTIFF-APPELLANT

Todd E. Zenger
KIRTON McCONKIE
60 East South Temple, Suite 1800
Salt Lake City, Utah 84111
Phone:  (801) 328-3600
Fax:  (801) 321-4893

Attorney for Plaintiff-Appellant

## **Certificate of Interest**

Pursuant to Federal Circuit Rule 47.4, Appellant timely filed a Certificate of Interest and provides that information as follows:

(1) The full name of every party or amicus represented in the case by the attorney:

Aqua Shield, Inc.

(2) The name of the real party in interest if the party named in the caption is not the real party in interest:

None.

(3) The corporate disclosure statement prescribed in Federal Rule of Appellate Procedure 26.1.:

No parent corporation.

(4) The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court:

Kirton McConkie, Todd E. Zenger, Salt Lake City, Utah

Krol & O'Connor, Igor Krol, New York, New York

# TABLE OF CONTENTS

STATEMENT OF RELATED CASES ......................................................................1

JURISDICTIONAL STATEMENT ......................................................................2

    A.    Basis For The District Court's Subject-Matter Jurisdiction.....................2

    B.    Basis For The Court of Appeals' Jurisdiction.........................................2

    C.    Filing Dates Establishing the Timeliness of the Appeal .........................2

    D.    The Appeal is From a Final Order or Judgment That Disposes of All Parties' Claims..............................................................................................3

STATEMENT OF THE ISSUES....................................................................................4

STATEMENT OF THE CASE.........................................................................................5

COURSE OF PROCEEDINGS ...................................................................................7

    A.    Disposition Below and Relevant Facts of Record....................................9

SUMMARY OF THE ARGUMENT .......................................................................25

ARGUMENT ......................................................................................................27

    A.    The District Court Committed Legal Error by Improperly Guaranteeing the Infringers a Profit on Infringing Sales.................................................27

    B.    The District Court Abused its Discretion in Assessing and Computing the Royalty Amount. ................................................................................28

        1.    The Royalty Amount Assessed by The District Court Was Based on an Error Of Law. ...............................................................................29

        2.    The Royalty Amount Assessed by The District Court Was Based on an Erroneous Conclusion of Law.....................................................29

        3.    The District Court's Assessment That the Royalty Amount Was to be Determined as a Percentage of Defendants' Net Profits is Clearly Erroneous..........................................................................30

4.      The District Court's Finding that Defendants' Net Profit Was 5 % is Clearly Erroneous. ....................................................................31

5.      The District Could Erred by Not Adding an Additional $450,000 of Infringing Sales. ...............................................................................36

C.    The District Court's Non-Willfulness Finding is Clearly Erroneous. ....40

1.      Defendants Lacked a Substantial Defense Before the District Court's November 2011 Infringement Order ..................................41

2.      Defendants Lacked a Substantial Invalidity Defense After The District Court's November 2011 Infringement Order ....................43

3.      The Clear and Convincing Evidence of Record Establishes That Defendants Continued Their Infringing Conduct Without Any Good Faith Product Redesign After the District's Court's November 2011 Infringement Order................................................44

D.    Increased Damages Should be Awarded to Aqua Shield........................46

1.      Deliberate Copying ...........................................................................48

2.      Investigation of Patent.....................................................................48

3.      Infringer's Behavior During the Litigation....................................49

4.      Infringer's Size and Financial Condition ......................................50

5.      Duration of Misconduct ...................................................................51

6.      Closeness of the Case.......................................................................51

7.      Remedial Actions Taken ...................................................................51

8.      Concealment by Infringer ................................................................52

9.      Motivation for Harm ........................................................................52

CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT;.............54

iv

# TABLE OF AUTHORITIES

## Cases

*Anderson v. Dept. of Health & Human Servs.*,
   907 F.2d 936 (10 Cir. 1990) ................................................................38

*Brown v. Southern Utah University*,
   No. 2:08-cv-542-TC, 2010 WL 1417861 (D. Utah April 6, 2010) ....................39

*Clark v. Summit County Sheriff*,
   507 F. Supp.2d 929 (D. Utah 2007)....................................................39

*Cybor Corp. v. FAS Tech., Inc.*, 138 F.3d 1448 (Fed. Cir. 1998) (en banc). ..........53

*Desai v. Panguitch Main Street, Inc.*,
   No. 2:04cv691, 2012 WL 5464954 (D. Utah November 8, 2012)....................39

*Domestic Fabrics Corp. v. Sears, Roebuck & Co.*,
   326 F. Supp. 2d 694 (E.D.N.C. 2004) ................................................53

*DSU Med. Corp. v. JMS Co., Ltd.*,
   471 F.3d 1293 (Fed. Cir. 2006) ................................................ 32, 34

*FDIC v. Phoenix Phones*,
   No. 1:10-cv-76 TS, 2011 WL 1775735 (D. Utah May 9, 2011) ........................39

*Fromson v. Western Litho Plate And Supply Co.*,
   833 F.2d 1568 (Fed. Cir. 1988) ........................................................28

*Fumi Elec. Co.*,
   593 F. Supp. 2d at 1116-17................................................................53

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970). ................................................27

*Hoechst Celanese Corp. v. BP Chems. Ltd.*,
   78 F.3d 1575 (Fed. Cir. 1996) ........................................................47

*Jurgens v. CBK, Ltd.*,
   80 F.3d 1566 (Fed. Cir. 1996) ........................................................47

*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*,
   383 F.3d 1337 (Fed. Cir. 2004) (en banc). ..........................................................41

*Lam, Inc. v. Johns-Manville Corp.*,
   718 F.2d 1056 (Fed. Cir. 1983) .................................................... 32, 34

*Odetics, Inc. v. Storage Tech. Corp.*,
   185 F.3d 1259 (Fed. Cir. 1999). ..........................................................47

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6ᵗʰ Cir. 1978) ............................................. 27, 28, 33

*Peterson v. U.S.*,
   No. 2:04-cv-962BSJ, 2006 WL 1184735 (D. Utah May 2, 2006) ......................39

*Read Corp. v. Portec, Inc.*,
   970 F.2d 816 (Fed. Cir. 1992) ...................................................... 47, 48

*Seagate Technology, LLC*,
   497 F.3d 1360 (Fed. Cir. 2007) (en banc) ..........................................................41

*SEC v. Merrill Scott & Associates*,
   505 F. Supp. 2d 1193 and n. 2 (D. Utah 2007)..................................................39

*Sensonics, Inc. v. Aerosonic Corp.*,
   81 F.3d 1566 (Fed. Cir. 1996) ...................................................... 32, 34

*Tegal Corp. v. Tokyo Electron America Inc.*,
   257 F.3d 1331 (Fed. Cir. 2001) ..........................................................40

*Transfac Capital, Inc. v. Celetano*,
   No.2:11-cv-00899 DN, 2013 WL 3973242 (D. Utah August 1, 2013)..............39

*Walker v. City of Orem*,
   451 F.3d 1139 (10th Cir. 2006) ..........................................................39

*Windsurfing Int'l v. AMF*,
   782 F.2d 995 n. 12 (Fed. Cir. 1986) ..........................................................27

## STATEMENT OF RELATED CASES

(a)    Whether any other appeal in or from the same civil action or proceeding in the lower court was previously before this or any other appellate court:

No.


(b)    The title and number of any case known to counsel to be pending in this or any other court that will directly affect or be directly affected by this court's decision in the pending appeal:

None known.

## JURISDICTIONAL STATEMENT

This appeal is properly before this Court.

### A.     Basis For The District Court's Subject-Matter Jurisdiction

The district court action was a patent infringement case seeking enforcement of United States Patent No. 6,637,160, damages and injunctive relief.  The district court had original jurisdiction under 28 U.S.C. §§ 1331 and 1338.

### B.     Basis For The Court of Appeals' Jurisdiction

This appeal is brought pursuant to 28 U.S.C. § 1295 (a) from a final decision of a district court of the United States in a civil action arising under an Act of Congress relating to patents.  The district court entered final judgment, Docket No. 179 awarding damages for patent infringement.

### C.     Filing Dates Establishing the Timeliness of the Appeal

The district court entered its initial judgment Docket No. 166 August 15, 2013.  A timely Rule 59 motion to amend the initial judgment was filed within 28 days on September 12, 2013.  The district court granted the Rule 59 motion in part in its Memorandum Decision and Order Docket No. 178 entered December 9, 2013.  The district court entered its Amended Judgment Docket No. 179 December 12, 2013.  Pursuant to FRAP 4(a)(iv) the time to appeal ran 30 days from the December 9, 2013 entry of the order disposing of the Rule 59 motion to amend.  A timely appeal was filed January 8, 2014.

### D.     The Appeal is From a Final Order or Judgment That Disposes of All Parties' Claims

The Amended Judgment of the United States District Court for the District of Utah (Docket No. 179) (attached hereto) is final as to all parties as to liability and damages.

As permitted by the Federal Rules of Civil Procedure, subsequent to entry of the Amended Judgment, the district court taxed costs in favor of Appellant Aqua Shield in the amount of $1971.17 (Docket No. 186, entered February 12, 2014).

## STATEMENT OF THE ISSUES

Whether the district court erred when it applied an improper legal standard for reasonable royalty to guarantee the adjudicated infringers a profit.

Standard of review:  denovo review of application of legal standard

In the alternative, the district court abused its discretion in assessing and computing the amount of the reasonable royalty under 35 U.S.C. § 284 resulting in a reasonable royalty that is outrageously too low.

Standard of review: abuse of discretion, abuse of discretion can be established by showing that the decision was based on an error of law, clearly erroneous fact(s) or that the district court made a clear error of judgment

Whether the district court improperly applied the legal standard for willfulness where defendants presented no objective, good faith basis of noninfringement or invalidity.

Standard of review:  clearly erroneous standard of review

4

## STATEMENT OF THE CASE

This is a patent case.  Aqua Shield, Inc. is a New York corporation doing business out of New York.  Aqua Shield is the assignee of United States Patent No. 6,637,160 issued October 28, 2003 to Bob Brooks ("the '160 Patent").  The '160 Patent protects certain telescoping pool enclosures.

Defendants below included four defendants:

(1)    Inter Pool Cover Team ("IPC") a European Economic Interest Grouping formed  under the laws of the European Union with its headquarters located at Alukov HZ, in Slatinany, Czech Republic.

(2)    Alukov HZ spol. S.r.o., a European business entity located in Slatinany , Czech Republic ("Alukov I').

(3)    Alukov spol. S.r.o, a European business entity located in Topolcany, Slovakia ("Alukov II").  Alukov I and Alukov II collectively referred to as "Alukovs."

(4)    Pool & Spa Enclosures, LLC, a limited liability company of New Jersey located in Monroe Township, New Jersey ("Pool & Spa").

IPC markets and promotes the manufacture and sale of infringing telescoping pool enclosures through its international members including the Alukovs and Pool & Spa.  The Alukovs make, sell and offer for sale infringing pool enclosures.  Pool & Spa imported infringing pool enclosures from the

Alukovs into the United States and further sold and offered for sale the infringing pool enclosures in the United States.

Aqua Shield sought enforcement of the '160 Patent including findings and judgment of infringement, damages and injunctive relief pursuant to 35 U.S.C. § 101 et seq. against IPC, the Alukovs and Pool & Spa below.

## COURSE OF PROCEEDINGS

Aqua Shield filed a patent infringement action October 18, 2005 in the United States District Court for the Eastern District of New York, civil no. 1:05-cv-04880-CBA-SMG.  Aqua Shield immediately sought a preliminary injunction for the limited purpose of preventing defendants from attending a particular trade show in Florida in the end of 2005 to exhibit infringing pool enclosures at which Aqua Shield would also be exhibiting its patented pool enclosures.  During the hearing, Aqua Shield withdrew the request for preliminary injunction without prejudice when an issue of personal jurisdiction was raised which the court wanted to decide before considering the merits of Aqua Shield's request for injunctive relief.[1]  During the preliminary injunction hearing, defendants presented no material evidence or opinion of noninfringement or invalidity.  The district court denied the motion for preliminary injunction without prejudice to refiling pending a resolution of the matter of personal jurisdiction.[2]

In March 2006, defendants below filed a motion to dismiss for lack of personal jurisdiction in New York.  The motion was heard in October 2006.  In 2007 the district court required Aqua Shield to pursue service upon the foreign defendants in accordance with FRCP 4(f) and the Hague Convention.  During 2008

---

[1]  A26, (October 26, 2005, (Order to Show Cause Hearing 10/2005 Hearing, pg. 24, kn. 23 to pg. 25, ln. 8)).

[2]  A28 (10/2005 Hearing).

the district court required supplemental submission regarding service upon the defendants. In January 2009, the New York district court determined the case could have been brought in Utah and transferred the case to the United States District Court for the District of Utah. The Utah district court assigned the case civil action no. 2:09-cv-00013-TS.

In 2011, Aqua Shield sought summary judgment as to infringement as to claims 1-16 of the '160 Patent relying on the structure and function of a Utah installation of one of defendants' infringing product identifying it as defendants' model Elegant pool enclosure. In opposition, defendants did not dispute that the Utah installation was defendants' model Elegant pool enclosure and asserted no noninfringement defense except as to claims 10 and 15. The district court also found that defendants failed to present any defense to infringement of claims 1-9, 12-14 and 16.[3]

Defendants also presented the same vague prior art assertions made in the New York matter as a defense to infringement, but the district court found that defendants failed to conduct an element-by-element analysis as to any of the prior art and declared these defenses "not sufficiently supported," and "unsupported."[4]

---

[3]  A32-A33 (DN 87, 3:16-4:5).

[4]  A37-A39 (DN 87, pp. 8-10).

In 2012, Aqua Shield sought summary judgment as to defendants' counterclaims including noninfringement and invalidity. Defendants also sought summary judgment as to invalidity of the asserted claims of the '160 Patent presenting published prior art. The district court found that defendants failed to present a substantial defense of invalidity.[5]

In preparation for trial, defendants attempted to disclose additional evidence of noninfringement. Aqua Shield sought and obtained a motion in limine that no additional evidence would be received to alter the court's previous findings of infringement.[6]

The case proceeded to a damage trial March 19-20, 2013. Thereafter, the parties submitted proposed findings of fact and conclusions of law.

### A.    Disposition Below and Relevant Facts of Record

Prior to bringing the New York action in 2005, Aqua Shield invited defendants to discontinue infringement and settle with Aqua Shield.[7] Defendants chose not to respond to seek to settle with Aqua Shield but chose to continue infringement and to litigate.[8]

---

[5]  A49-A51 (DN 129, pg. 9, ln. 9 to pg. 11, ln. 14).

[6]  A55 (DN 147, pg. 2 ¶¶ 1 and 2).

[7]  A330-A336 (Trial Exhibits 8 and 10).

[8]  A22 (Oct. 25, 2005 New York hearing, pg. 22, lines 21-22).

In opposition to Aqua Shield's motion for preliminary injunction before the New York district court, the substance of defendants' 2005 argument for noninfringement of claim 1 comprised:

> [S]ome of IPC's pool enclosures do not include 'a pair of end panels,' some do not include 'horizontal rails,' some do not include 'rectangular panels,' and some do not include 'horizontal frame members.' Each of these elements are required by claim 1, and the absence of any one of them in a particular pool enclosure product renders such product noninfringing.[9]

In opposition to Aqua Shield's motion for preliminary injunction before the New York district court, the substance of defendants' 2005 argument for invalidity of claim 1 comprised:

> As discussed above, at least five of the pool enclosures shown on IPC's website were offered for sale by IPC before Mr. Brooks even filed for his patent. Thus, any one of these could render the '160 patent invalid, particularly if plaintiff alleges infringement by such product(s).
>
> Further, one of the elements of claim 1 of the '160 patent is "a means for a plurality of horizontal rails." IPC has used a plurality of horizontal rails for its pool enclosures since at least February 4, 2000, as depicted in the engineering schematic drawing of the rails used by IPC in connection with at least some of its pool enclosures (Sarney Decl., Exhibit C). As such, this raises a substantial question of validity.
>
> Furthermore, several other publications and foreign patents, dated prior to Mr. Brooks' having filed his patent application, show some, if not all of the elements of the claimed invention. First, a 1986 French patent shows arc shaped telescoping roofing

---

[9] A66 (NY Oppos., pg. 10).

elements of a pool enclosure installed on removable rails (See Sarney Decl. Exh. D). Second, a brochure for Arqualand pool enclosures states that the company has been constructing pool enclosures for 35 years (Sarney Decl., Exh. E). A comparison of the pictures of the depicted Arqualand enclosures, when compared to a picture of plaintiffs pool enclosure (Sarney Decl., Exh. F), shows a remarkable similarity, including arc roofing elements on rails.

Next, a 1981 Australian patent shows these same elements (Sarney Decl., Exh. G). Finally, the advertisement for Eureka states that it has been manufacturing telescopic pool enclosures for the last 20 years. The pictures of this product again show most, if not all of the elements of claim 1 of the '160 patent (Sarney Decl., Exh. H).

While IPC does not contend that this showing is sufficient to prove invalidity, it does submit that, at this stage, and given the very short time to respond plaintiffs expedited application, IPC has, at least, demonstrated that there are substantial issues relating to the validity of the '160 patent. Accordingly, for this reason as well, plaintiff's application for injunctive relief should be denied.[10]

In 2011 after transfer to the Utah district court, Aqua Shield sought a determination by summary judgment that certain of defendants' pool enclosures infringed the '160 Patent. Aqua Shield accused, that "Defendants' Products" comprising "models sold under the name 'Universe,' 'Luguna,' 'Elegant,' 'Tropea,' 'Combi,' 'Style,' 'Veranda,' 'Spa Veranda,' and 'Orient'" infringed one or more claims of the '160 Patent.[11]    The representative infringement was

---

[10]  A67-A68 (NY Oppos., pp. 11-12).

[11]  A76 (DN 60 pp. vi lns. 4-7).

presented element-by-element.[12]  The Utah Installation was expressly identified as the model Elegant.[13]  Aqua Shield's proper Rule 56 declaration expressly identified the  defendants' model Elegant as one of defendants' products[14] and expressly defined it as the "Utah Installation."[15]  The representative infringement analysis was presented element-by-element.[16]

In opposition to Aqua Shield's motion for summary judgment, defendants' did not contest or controvert the identification and definition of the Utah Installation as the model Elegant.[17]

The substance of defendants' 2011 argument for noninfringement of claim 1 was the same as its 2005 noninfringement position, namely:

> Moreover, some of IPC's pool enclosures do not include 'a pair of end panels,' some do not include 'horizontal rails,' and some do not include 'rectangular panels,' and some do not include 'horizontal frame members.'  Each of these elements is required by claim 1, and the absence of any one of them in a particular pool enclosure product renders such product noninfringing.[18]

---

[12]  A81-A86 (DN 60, pp. xi-xvi).

[13]  A81, A86 (DN 60, pp. xi, ¶ 37 lns. 5-9, and pp. xvi, ¶ 60 lns. 4-7).

[14]  A98 (DN 60-1, pg. 2 ¶ 7).

[15]  A102 (DN 60-1, pg. 6, ¶ 40, pg. 11, ¶ 63).

[16]  A102-A107 (DN 60-1, pp. 6-11, ¶¶ 40-63 and in the and accompanying claim chart).

[17]  A32-A36 (DN 87, pgs. 3-7).

[18]  A137. (DN 67, pg. 20).

As to this defense, the Utah district court determined that defendants' 2011 arguments for noninfringement  of claim 1 failed to carry their burden of presenting a prima facie case of noninfringement.[19]

Defendants presented no noninfringement evidence or arguments whatsoever as to infringed claims 2-9, 11-14 and 16.[20]

Defendants also argued the same 2005 invalidity positions:

> Evidence in the record suggests that of the models referenced by plaintiff in its moving papers, at least five were offered for sale by IPC in 2000 and the spring of 2001, prior to Mr. Brooks having even filed for his patent in July 2001. *(See, IPC Price Lists, Declaration of Gregory J. Coffey, Exhibit 1b.).* According, if those five products are alleged to be infringing, then convincing evidence exists to suggest that the '160 patent is invalid.[21]

The Utah district court determined that this 2011 invalidity argument of defendants based on prior sales was meritless because it was  "unsupported" by probative evidence.[22]

In opposition to Aqua Shield's motion for summary judgment as to infringement, defendants also argued other 2005 invalidity contentions:

> Finally,  IPC's own engineering schematics anticipates the '160 patent claims.  The 'classic' test for anticipation is: 'That which

---

[19] A32-A37 (DN 87, pp 3-8).

[20] A32-A33 (DN 87, pg. 3 ln. 16 to pg. 4 ln. 5).

[21] A137 (DN 67, pg. 20).

[22] A39 (DN 87, pg. 10).

will infringe, if later, will anticipate, if earlier.' *Chisum on Patents* § 3.02[1][f]. This is the situation here. One of the elements of claim 1 of the '160 patent is 'a means for a plurality of horizontal rails.' IPC has used a plurality of horizontal rails for its pool enclosures since at least February 4, 2000, as depicted in the engineering schematic drawings of the rails used by IPC in connection with at least some of its pool enclosures. (*See, Declaration of Gregory J. Coffey, Exhibit 1c.*). As such, evidence exists that IPC developed, offered and used the plurality of horizontal rails now accused of infringement in 2000 – before Mr. Brooks filed for the '160 patent.[23]

The Utah district court determined that this 2011 invalidity argument of defendants based on IPC engineering schematics was "not sufficiently supported" because it failed to make a prima facie because defendants only addressed one claim element without even attempting to show that every element of every asserted claim was included in the schematics.[24]

Defendants also argued other 2005 invalidity positions in their 2011 opposition:

More importantly, the '160 patent, filed in 2001, is invalid over prior art, the contents of which are set forth in the attached exhibits to the accompanying Declaration of Gregory J. Coffey. Specifically, several foreign patents, dated prior to Mr. Brooks having filed his patent application, show some, if not all of the elements of the claimed invention. First, a 1986 French patent shows arc shaped telescoping roofing elements of a pool enclosure installed on removable rails. (*See, Declaration of Gregory J. Coffey. Exhibit Id*). Second, a 1981 Australian patent

---

[23] A140 (DN 67, pg. 23).

[24] A38 (DN 87, p 9).

shows the same arc shaped telescoping roofing elements of a pool enclosure installed on removable rails. (*See, Declaration of Gregory J. Coffey, Exhibit Ig*). This is the claimed invention. The reference to these claims therefore anticipates and renders invalid the asserted claims of '160 patent.[25]

The district court rejected this 2011 invalidity argument of defendants based on the 1986 French and 1981 Australian patents for only addressing one claim element and failing to present element-by-element evidence of invalidity.[26]

In 2011, the district court determined infringement of claims 1-14 and 16 of the '160 Patent by defendants' Utah Installation (model Elegant) and by defendants' other product models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient.[27]   Thereafter, in an *in limine* order the district court precluded later attempts to introduce evidence to alter the infringement determination.[28]

In 2012, Aqua Shield also sought a determination that defendants' invalidity counterclaim was without merit as to the alleged Arqualand and Eureka prior art. Aqua Shield argued: "Defendants do not show that the Internet printouts, the Eureka reference or the Arqualand documents teaches each and every element of claims 1-14 and 16. Merely showing one or some claims elements does not

---

[25] A140 (DN 67, pg. 23).

[26] A38 (DN 87, pg. 9).

[27] A32, A37, A40 (DN 87, pgs. 3-8, 11).

[28] A54 (DN. 147).

anticipate or render the claimed invention obvious."[29]   In response defendants

neither further referenced nor argued the merits of the Arqualand and Eureka

references.    This abandonment of the Arqualand and Eureka defenses by

defendants reveals that reliance upon the Auqualand and Eureka references for

invalidity was without merit.

Instead, the substance of defendants' 2012 argument of invalidity of claim 1

shifted to prior art already considered by the Patent Office during prosecution of

the '160 patent including only general and vague arguments about prior Last,

Lamb, Kumode and Ozdemir patent teachings.[30]   The district court found that

defendants arguments utterly failed to present a substantial defense because

defendant had "not compared the construed claims of the '160 patent to the prior

art," presented "no analysis of the Court's claim construction," as to anticipation

defendants introduced no evidence showing that the prior art disclosed  each claim

element,  "Defendants have not argued obviousness on a claim-by-claim basis" and

"Defendants also do not try to show that all the elements of even a single  claim in

in the '160 patent were made obvious by prior art."[31]

---

[29] A153 (DN 119, pg. 6).

[30] A158-A160, A165-A167, A169-A170 (DN 120, pp. 2-4, 9-11, 13-14).

[31] A49-A51 (DN 129, pg. 9 ln. 9 to pg. 11 ln. 14).

At the damage trial, defendants' invoice documents for each infringing pool enclosure imported into the United States established that the pool enclosure was shipped "dismantled in parts."[32] The witness designated to testify for defendants, Mr. Stonkus, testified that "dismantled in parts" meant that the pool enclosures were shipped in pieces and first assembled in the United States, including the attachment of removed end panels.[33]

14 Q So if Alukov ships them dismantled, then they come over

15 in the parts and you assemble them here; is that correct?

16 A That is correct.

17 Q That would include the end panel, correct?

18 A An end panel may be attached, fixed in the factory, or

19 it might be put together and affixed in U.S.

20 Q But if it's shipped dismantled, then you assemble it

21 when it gets here? If it's shipped dismantled, Pool & Spa

22 assembles it when it gets here, correct?

23 A Yes. (DN 152, pg. 266).

         * * *

12 Q But otherwise whatever parts that come from Alukov,

13 it's transferred to another truck and gone to the customers

14 for installation, right?

---

[32] A173-A233 (Trial Ex. HH).

[33] A242, A243, A246 (DN 152, pp. 266, 268, 273).

15 A Yes. The overwhelming [sic] will go as we receive them to

16 the customer, yes.  (DN. 152, pg. 268).

* * *

7 Q If it's shipped dismantled, you build it on-site,

8   including placing the end panels on, correct?

9   A That is correct.  (DN 152, pg. 273)

Shipment of infringing pool enclosures "dismantled in parts" included shipments between October 2008 until the district court's November 2011 Infringement Order finding infringement.[34]  Shipment of infringing pool enclosure "dismantled in parts" continued after November 2011 Infringement Order through the district court's January 2013 order upholding the validity of the claims of the '160 patent.[35]  Shipment of infringing pool enclosure "dismantled in parts" again continued after the district court's order upholding validity.[36]

At the damage trial, evidence of a potential royalty rate was based on a percentage of the selling price of the infringing pool enclosures.[37]

---

[34] A265-A310 (DN 172-2).

[35] A310-A326 (DN 172-3).

[36] A327-A328 (DN 172-4).

[37] A329 (Trial Exhibit CC (percentages of "sel[l]ing prices")) and A253-A255, (corresponding testimony of the Pres. of Aluko Trial Transcript , 302:24-304:1), A239, A240, A244-A245, (trial testimony of defendants' witness Mr. Stonkus, 238:8-18 (reasonable royalty "should be fair, probably 6%"), 240:19-20 (6% is "fair" percentage), 269:23 to 270:2 (proposed royalty to mimic commission paid to salesman of "selling price")).

After the damage trial in March 2013, the district court entered Findings of Fact[38] including:

- Defendants did not reply upon opinion of patent counsel to proceed with sales of infringing pool enclosures.[39]

- Defendants received $2.7 million dollars of revenue from the sale of infringing devices.[40]

- Aqua Shield and defendants were the only companies in the United States for the relevant pool enclosures.[41]

- Aqua Shield's business policy was to not license others.[42]

- Aqua Shield and defendants were direct competitors.[43]

- Prior to the district court's November 2011 Infringement Order, the defendants had a reasonable belief that their pool enclosures did not infringe because the New York district court denied Aqua Shield's motion for preliminary injunction.[44]

_____

[38] A337-A374 (DN 165)

[39] A34 (DN 165, FF 20, pg. 10).

[40] A346 (DN 165, FF 19, pg. 10).

[41] A343 (DN 165, FF 12, pg. 7).

[42] A357 (DN 165, FF 49, pg. 22).

[43] A344 (DN 165, FF 15, pg. 8).

[44] A346 (DN 165, FF 20, pg. 10).

- After the district court's 2011 November Infringement Order, the defendants had a reasonable belief that their pool enclosures did not infringe because defendants attempted to design around the patented invention by fixing the end panels of their pool enclosures in place so the end panels were not removeable.[45] To reach this conclusion the district court relied entirely upon the hearsay testimony of Mr. Stonkus, namely:

> Mr. Stonkus testified that after the Court's ruling on infringement he contacted Defendants' factory in the Czech Republic, and
>
>> 'spoke to their design people as well as people in the office. I had a lead person there and specifically directed them that we cannot ship into the United States any enclosures that have detachable faces. So that was very clear to them. We talked about how we would change that. They felt certainly we're going to make them fixed, permanent faces.'[46]

After the damage trial in March 2013, the district court made Conclusions of Laws including:

- Aqua Shield was not entitled to lost profits because Aqua Shield's evidence as to profit margins and fixed and variable costs comprised only

---

[45]  A346 (DN 165, FF 21, pg. 10).

[46] A347 (DN 165, pg. 11, lns. 1-7, citing Trial Transcript, 200:9-15); A342 (DN 178, pg. 5, lines 7-8, citing DN 153, Trial Transcript, pg.79)

the testimony of the President of Aqua Shield whose testimony the district court deemed not credible.[47]

- The district court determined that the parties' negotiations of after the commencement of litigation were not probative in determining a reasonable royalty rate.[48]

- The district court concluded that six out of eight *Georgia Pacific* factors considered by the district court favored a higher royalty rate.[49]

- The district court determined it was "unable to determine a reasonable royalty rate" and denied Aqua Shield request for a reasonable royalty.[50]

- That this was not an exceptional case[51] in which attorney fees could be awarded to Aqua Shield under 35 U.S.C. § 285 because:

  o The defendants did not willfully infringe[52] because they had a reasonable belief that their pool enclosure did not infringe because of the denial of Aqua Shield's motion for preliminary injunction

---

[47] A350 (DN 165, FF 20, pg. 13)

[48] A356-A357 (DN 165 FF 45-47, pgs. 20-21)

[49] A357-A365 (DN 165 FF 49-56, pgs. 21-24)

[50] A362-A363 (DN 165, FF 62-63, pgs. 26-27)

[51] A366 (DN 165 FF 69, pg. 30)

[52] A365 (DN 165, FF 66, pg. 29)

and because of defendants' attempt to design around the patented invention.[53]

    o  The defendants' did not act in bad faith, engage in litigation misconduct or exhibit bad behavior.[54]

- No increased damages awarded under 35 U.S.C. § 284 because defendants did not willfully infringe.[55]

- No injunction as to sales of defendants' model Elegant because the district court "has not found Defendants' model Elegant to infringe the '160 Patent."[56]

Aqua Shield filed a timely motion under Rule 59 to amend the judgment seeking an award of damages as to all infringing devices including the Utah installation (model Elegant) pool enclosure and findings as to willfulness, increased damages and attorney fees.   The district court granted the Rule 59 motion in part:

- finding eight percent (8%) to be a reasonable royalty percentage.[57]

---

[53] A365 (DN 165 FF 67, pg. 29)

[54] A366 (DN 165 FF 68, pg. 30)

[55] A366-A367  (DN 165 FF 71, pgs. 30-31)

[56] A372-A373  (DN 165 FF 84, pgs. 36-37)

[57] A386 (DN 178, pg. 12, lns. 4-15)

- o The district court finding was based on consideration of a number of factors "while still allowing Defendants on profit on infringing sales."[58]

- o The district court stated: "Based on the preceding discussion, the Court finds that the parties, at the outset of this litigation, would have negotiated a reasonable royalty of 8% of Defendants' net profits, or $10,800."[59]

- but only awarded $10,800 on $2.7 million dollars of infringing selling price sales.[60]

The district court again concluded that the 2009 negotiations of the parties "did not provide evidence of a reasonable royalty rate."[61]

The district court would not:

- include the Utah installation (model Elegant) as an infringing device.[62]

- include the additional $450,000 of sales of the model Elegant in damage calculations.[63]

---

[58] A386 (DN 178, pg. 12 ln. 7)

[59] A386-387 (DN 178, pg. 12 ln. 18 to pg. 13 ln. 2)

[60] A386-A387 (DN 178 FF 67, pg. 12, ln. 18 pg. 13 ln. 2)

[61] A386 (DN 178, pg. 7, ln. 5, citing Findings of Fact DN 165, at 20)

[62] A387 (DN 178, pg. 13)

- find willful infringement, and hence no increased damages or attorney fees because the "prior to the Court's Order on infringement, Defendants had a reasonable belief that their pool enclosures did not infringe the '160 Patent" and "after the Court's infringement Order, Defendants made a good faith effort to design around the '160 Patent."[64]

The district court entered a corresponding Amended Judgment.[65]

The court taxed cost in favor of Aqua Shield, the prevailing party.[66]

---

[63] A387 (DN 178, pg. 13)

[64] A378-A379 (DN 178, pg. 4, ln. 13 to pg. 5, ln. 10)

[65] A389 (DN 179)

[66] A389 (DN 179)

# SUMMARY OF THE ARGUMENT

The district court erred when it applied an improper legal standard for reasonable royalty.   The district court did so by requiring itself  to allow defendants to make an actual profit on its infringing sales.  This was legal error.

The district court abused its discretion by concluding that the computation of damages would only be a percentage of the net profits of the infringing sale.

At trial defendants argued for a royalty rate based on the selling price of the infringing devices.  However, in order to ensure the infringers a profit the district court based the royalty not on a percentage of the selling price of the infringing devices but on a percentage of the "net profits" of the defendants.

This error resulted in an effective royalty reasonable rate of  0.4 %.  Under the facts and circumstances of this case such a royalty is outrageously too low. This application of the law by the district court improperly endows the infringers with the disfavored heads-I-win tails-you-lose windfall discouraged by subsequent cases such as *Panduit, Fromson* and others.

The district court also misapplied the legal standard for willfulness.  In over seven years of litigation defendants never presented a substantial, objective defense let alone a prima facie defense of noninfringement or invalidity.   Defendants' noninfringement and invalidity positions did not materially change from October 2005 through November 2012.

In connection with the 2005 preliminary injunction proceeding, the New York district court made no finding as to noninfringement or invalidity upon which defendants could believe they had the go ahead to continue infringing. The New York district court merely postponed addressing the infringement and validity issues while it first decided personal jurisdiction. Therefore, defendants' reliance upon the lack of a preliminary injunction provided no objective basis of a belief as to noninfringement or invalidity.

The district court below confirmed that the noninfringement and invalidity defenses and counterclaims advanced by defendants from 2005 to 2012 lacked merit and/or failed to present a prima facie defense. Lacking substantial objective defenses, defendants could not have a good faith belief as to noninfringement or invalidity.

## ARGUMENT

### A.     The District Court Committed Legal Error by Improperly Guaranteeing the Infringers a Profit on Infringing Sales.

The district court cited a statement of the reasonable royalty standard in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).[67]  However, the district court erred as a matter of law under that standard when it determined it was required to allow "Defendants a profit on infringing sales."[68]

Whether an infringer would have made an actual profit while paying the royalty is irrelevant.[69]  The reasonable royalty assessment and computation are not "designed to ensure the anomalous result of guaranteeing an actual profit to an infringer."[70]  Permitting the district court to guarantee defendants a profit on infringing sales "would also make an election to infringe a handy means for competitors to impose a 'compulsory license' policy upon every patent owner."[71]

---

[67] A379-A380 (DN 178, pp. 5-6)

[68] A386 (DN 178, pg. 12 ln. 7)

[69] *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1164 (6th Cir. 1978)(Whether, as events unfurled thereafter, [defendant] would have made an actual profit, while paying the royalty … is irrelevant.").

[70] *Id.; c.f., Windsurfing Int'l v. AMF*, 782 F.2d 995, 1003 n. 12 (Fed. Cir. 1986) ("One who elects to build a business on a product found to infringe cannot be heard to complain if an injunction against continuing infringement destroys the business so elected.").

[71] *Panduit,* at 1158.

Under its stated standard, the district court improperly guaranteed at least some of the defendants an actual profit on infringing sales. It then went on to do so by assessing the determined royalty rate against defendants' "net profits"[72] discussed further below. This guarantee of an actual profit on infringing sales was legal error. Permitting the district court to do so improperly put the adjudicated infringers in the disfavored "heads-I-win, tails-you-lose" position.[73] As a result, the judgment of the district court limiting the amount of the reasonable royalty to only $10,800 should be vacated.

### B.    The District Court Abused its Discretion in Assessing and Computing the Royalty Amount.

Assessing and computing damages under 35 U.S.C. § 284 is a matter within the discretion of the district court.[74] Abuse of discretion is established by showing that the district court's assessment and computation was based on an error of law, on clearly erroneous fact findings or on that fact the district court made a clear error of judgment.[75]

---

[72] A386 (DN 178, pg. 12, lines 11-13)

[73] *Panduit,* at 1158.

[74] *E.g., Fromson v. Western Litho Plate And Supply Co.,* 833 F.2d 1568, 1576 (Fed. Cir. 1988)

[75] *Id.* at 1577.

1.    <u>The Royalty Amount Assessed by The District Court
Was Based on an Error Of Law.</u>

As established in the previous section A, the amount of the reasonable royalty awarded by the district court limited to "net profits" was based on legal error and should be vacated.

2.    <u>The Royalty Amount Assessed by The District Court
Was Based on an Erroneous Conclusion of Law</u>

The district court twice concluded that the parties 2009 negotiations "do not provide evidence of a reasonable royalty rate."[76]  The district court analyzed the timing, impetus and results of the negotiations to conclude that the negotiations did not establish a royalty rate or provide evidence of a reasonable royalty rate. However, the negotiations do in fact provide other evidence of a reasonable royalty, namely, that any royalty between the parties was to be based on the actual selling price of the defendants' pool enclosures.  The negotiations of the parties called for a percentage of the selling prices.[77]  The parties discussed and exchanged documents related to a percentage royalty of the actual selling price of the pool enclosures.  The conclusion of the district court that the 2009 negotiation provided

---

[76] A381 (DN 178, pg. 7 lns. 9-10, citing earlier Findings of Fact and Conclusions of Law DN 165, pg. 20)

[77] A330 (Trial Exhibit CC, ("license fee will be Alukov sel[l]ing prices")).  Trial Exhibit CC was prepared by the President of defendant IPC, Mr. Jan Zitko.  A253-255 (DN 152 Trial Transcript, 302:15-304:1)

no evidence of a reasonable royalty is erroneous. This Court should vacate the district court's reasonable royalty assessment limited to net profits of infringing sales because it fails to consider relevant evidence from the parties' negotiations including the royalty being a license fee of the selling price of the infringing pool enclosures.

> 3.    The District Court's Assessment That the Royalty Amount Was to be Determined as a Percentage of Defendants' Net Profits is Clearly Erroneous.

As established above, Mr. Zitko negotiated a royalty based on the selling price of the infringing pool enclosures. This is corroborated by the trial testimony of defendants' witness Mr. Stonkus. He urged the court to recognize a six percent (6 %) royalty as fair, but unlike the court's computation, Mr. Stonkus also testified it was based on the selling price of the pool enclosures.[78]

Contrary to defendants' admissions that they would be willing to pay a royalty based on the selling price of the infringing sales, the district court made a finding that defendants would be willing to pay a percentage "of their *net profits* on infringing sales as a reasonable royalty to avoid infringement" (emphasis

---

[78] A239, A241, A244-245 (trial testimony of defendants' witness Mr. Stonkus, Trial Transcript, 238:8-18 (reasonable royalty "should be fair, probably 6%"), pg. 240 lines 19-20 (6% is "fair" percentage),  269: 23- 270:2 (proposed royalty paid on the "selling price")).

added).[79]  Without any citation to the record, the district court jumped from the evidence of a percentage of the selling price as testified by defendants to a percentage of the "net profits on infringing sales."  This finding was clearly erroneous as a matter of fact.

It appears the court jumped to "net profits on infringing sales" because just five lines earlier the court had concluded that it was required to allow "Defendants a profit on infringing sales,"[80] also an error of law.

4.    The District Court's Finding that Defendants' Net Profit Was 5 % is Clearly Erroneous.

Notwithstanding discovery requests for financial documents, the Alukov defendants produced no financial records from which Aqua Shield could calculate profit figures for the Alukov defendants.  Aqua Shield sought to preclude defendants from presenting damage evidence not previously disclosed.[8182]  In

---

[79] A386 (DN 178, pg. 12 lns. 12-13)

[80] A386 (DN 178, pg. 12 ln. 7)

[81] A390-A402 (DN 145)

[82] The Alukov defendants produced no financial records related to profits or any expenses such as overhead costs across the Alukov defendants and no financial records that overhead costs across the Alukov defendants corresponded to overhead expenses related to sales of the infringing devices.  Again, any doubts on the issue of damages due to the Alukov defendants' failure to keep or present proper records should have been decided in favor of Aqua Shield; any confusion or difficulties caused by defendants' records should be held against the Alukov defendants, not Aqua Shield.  *E.g., DSU Med. Corp. v. JMS Co., Ltd.,* 471 F.3d

31

granting the motion the district court declared: "Plaintiff next seeks preclusion of any evidence not previously disclosed by Defendants, particularly as such evidence relates to the issue of damages. Defendants respond that they do not intend to introduce any evidence which they have not already provided to Plaintiff. The Court will therefore grant the Motion and prevent Defendants from introducing at trial any damages evidence not previously disclosed to Plaintiff."[83]    This established the law of the case.

Nevertheless, defendants presented additional damages evidence at trial. Mr. Zitko and Mr. Stonkus testified at trial as to profits of the Alukov defendants. This was clear error.

Without presenting a single financial document for foundation, Mr. Zitko testified at trial that the net profit for the Alukov defendants "for all the products and all the goods and all the services provided for Alukov, not just for the devices that have been shown to infringe" was five to eight percent (5-8 %)[84] and that the Alukov defendants did not have any separate records reflecting net profits for infringing sales, but that the Alukov defendants only kept one set of overall books

---

1293, 1309 (Fed. Cir. 2006); *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1572-73 (Fed. Cir. 1996); *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1065 (Fed. Cir. 1983).

[83] Appendix 55 (DN 147, pg. 2, ¶ 3)

[84] Mr. Stonkus testified he had been told that the Alukov profit was 5%. A237-A238 (DN 152, 229: 22-230:3)

for all products.[85]  He was unable to identify the profits for any of the infringing sales by the Alukov defendants.[86]  Nevertheless, the district found that that the net profits for the Alukov defendants was 5%.[87]  This finding is clearly erroneous.[88]

As to the profits of defendant Pool & Spa, Aqua Shield showed from Pool & Spa's own financial documents that its net profits ranged from 12%-39%.[89]  Based on the financial documents provided by Pool & Spa, defendant Pool & Spa had just over $600,000 of net income/profit on $2,700,000 of sales of infringing pool enclosures.[90]  This equates to a twenty-two percent (22%) net profit on infringing sales.

The district court rejected the 22% figure.  The district court stated without citations to any financial records:  "The Court cannot rely upon these figures as representing net profits because while the financial records reflect transaction costs associated with infringing sales they do not reflect overhead costs across the

---

[85] A249-A250 (DN 152, 293:4- 294:7)

[86] A250 (DN 152, 294:9-12)

[87]  A55 (DN 178, pg. 11)

[88] *E.g., Panduit*, at 1164 (it is erroneous to base profits for infringing sales on overall profit of all product sales).

[89]  A384 (DN 178 pg. 10 lns. 9-12)

[90] A385 (DN 178, pg. 11 lines 9-12), A526-A528(Trial Exhibit DD at IPC 0220-0222).

company."[91]   However, such records were not presented as evidence because Pool & Spa withheld the documents and information.

Aqua Shield presented profits of defendant Pool & Spa based on the financial documents provided by Pool & Spa.  Defendant Pool & Spa produced and presented no financial records related to any overhead costs across defendant Pool & Spa, let alone any financial records that overhead costs across Pool & Spa corresponded to overhead expenses related to sales of the infringing devices.  Any doubts on the issue of damages due to Pool & Spa's failure to keep, produce, or present proper records should have been decided in favor of Aqua Shield; any confusion or difficulties caused by defendants' records should be held against defendants, not Aqua Shield.[92]   In rejecting the profit figures for Pool & Spa, the district court made an error of law by improperly shifting the burden of production and persuasion and improperly decided to hold the confusion and difficulty against Aqua Shield instead of against Pool & Spa.  This was legal error.[93]   The district court's failure to recognize the net income/profits calculated from defendant Pool & Spa's financial records was both an error of law and clear error of judgment.

---

[91] A384 (DN 178 pg. 10 lns. 12-14, *see also* pg. 11 lns. 5-7)

[92] *E.g., DSU*, at 1309; *Sensonics*, at 1572-73; *Lam*, at 1065.

[93] *Id.*

Furthermore, the district court improperly allowed Mr. Stonkus to contradict company records and testify that Pool & Spa had purportedly operated at a loss since it began.[94] The district court adopted this testimony and found that Pool & Spa had no profit.[95]

In the end the district found that defendants "profits on infringing sales is 5%."[96] For reasons stated above, this finding was an error of law, clearly erroneous and a clear error of judgment.

Utilizing the erroneous 5% profit value, the district court computed defendants' "net profits on infringing sales" to be $135,000, that is, 5% of the $2,700,000 of infringing sales. *Id.* Because the 5% profit finding was error, the finding of "net profits" at $135,000 was also an abuse of discretion. Based on these errant figures, the district court's judgment limiting the amount of a reasonable royalty to just $10,800 should be vacated.

Permitting these erroneous findings to stand improperly allows Pool & Spa to divert at least $2,700,000 of ill-gotten sales revenue from the only other supplier in the market, namely Aqua Shield, and defendants pay nothing but an outrageously low $10,800 dollars. In the meantime, the Alukov defendants pocket

---

[94] A238 (DN 152, page 230 lns. 8-11)

[95] A386 (DN 178, pg. 12 lns. 1-2)

[96] A238 (DN 178, pg. 12 lns. 2-3)

5% of their selling price to Pool & Spa and Pool & Spa hides behind its purported no profit business model. This is contrary to the underlying principle of patent damages to compensate Aqua Shield for damage caused by infringement.

35 U.S.C. § 284 states: "Upon a finding for the claimant, the court shall award the claimant damages adequate to compensate for the infringement, …" Under the district court's rationale and judgment, adjudicated infringer Pool & Spa gets $2,700,000 in revenue to build an infringing, competing business for about five years (2008 to 2013) and the owner of a valid and infringed patent, Aqua Shield, gets $10,800. It is outrageous to conclude that $10,800 compensates Aqua Shield for defendants' $2,700,000+ diversion of revenue and their improper presence as a competitor in the two-supplier market all caused by defendants' unlawful infringement.

### 5. The District Could Erred by Not Adding an Additional $450,000 of Infringing Sales.

The district court found $2,700,000 in infringing sales without the inclusion of defendants' model Elegant.[97]

On the record below, Aqua Shield properly alleged infringement by defendants' model Elegant: "The enclosure displayed and sold under the name

---

[97] A341, A342, A346 (DN 165, Finding of Fact 9, 10 and 19, pp. 5, 6 and 10).

'Elegant' displayed on IPC's website infringes at least claim 1 of the '160 Patent."[98]

In its Rule 56 motion, Aqua Shield accused, that "Defendants' Products" comprising "models sold under the name 'Universe,' 'Luguna,' 'Elegant,' 'Tropea,' 'Combi,' 'Style,' 'Veranda,' 'Spa Veranda,' and 'Orient'" infringed one or more claims of the '160 Patent.[99]   The representative infringement was presented element-by-element.[100]   The Utah Installation was expressly identified and defined as the model Elegant.[101]

Aqua Shield's proper Rule 56 declaration expressly identified the defendants' model Elegant as one of defendants' products[102] and defined it as the "Utah Installation."[103]   The representative infringement was presented element-by-element.[104]

In opposition to Aqua Shield's Rule 56 motion, defendants' did not contest or controvert the identification and definition of the Utah Installation as the model

---

[98]   A532 (DN 27 First Amended Complaint, ¶ 19, pg. 4)

[99]   A76 (DN 60 pg. vi lns. 4-7)

[100]   A81-A86 (DN 60, pp. xi-xvi)

[101]   A81 (DN 60, pg. xi, ¶ 37 lns. 5-9, and pg. xvi, ¶ 60 lns. 4-7)

[102]   A98 (DN 60-1, pg. 2 ¶ 7)

[103]   A81 (DN 60-1, pg. 6, ¶ 40, pg. 11, ¶ 63)

[104]   A98 (DN 60-1, pp. 6-11, ¶¶ 40-63 and in the and accompanying claim chart)

Elegant.[105]  The district court made no finding that there was a genuine issue of material fact as to whether the Utah Installation was defendants' model Elegant. Neither the defendants nor the district court timely presented or relied upon any evidence controverting that the Utah Installation was defendants' model Elegant.[106]

Defendants were required to controvert facts, if desired.[107] Defendants' waived this right by failing to do so.

Uncontroverted facts are deemed admitted by the nonmoving party.  The Local Rules of the district court below deem uncontroverted facts as admitted:

> For the purpose of summary judgment, all material facts of record meeting the requirements of Fed. R. Civ. P. 56 that are set forth with particularity in the movant's statement of material facts will be deemed admitted unless specifically controverted by the statement of the opposing party identifying and citing to material facts of record meeting the requirements of Fed. R. Civ. P. 56.

URCivP 56-1 last paragraph.[108]    There was no order in the district court proceedings below that local rule URCiv 56-1 (c) did not apply in this case.

---

[105] A102-107 (DN 87, pgs 3-7)

[106] Shortly before trial the defendants attempted to reopen the evidence as to infringement.  The court refused and ordered all evidence as to infringement closed.  A55 (DN 147, pg. 2 paras. 1 and 2)

[107] *Anderson v. Dept. of Health & Human Servs.*, 907 F.2d 936, 947 (10 Cir. 1990) (quoting *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)) cited by the district court at DN 87 at pg 5.  Local Rule URCivP 56-1(c)(2)(B) (non-movant required to controvert contested facts).

Nevertheless, the district court has refused to recognize the adjudicated, infringing Utah Installation as defendants' model Elegant for purposes of infringement, damages and injunctive relief.[109]  The district court has explained: "Although Brooks averred that the Elegant was the model installed in Syracuse, Utah, the Court never adopted such a finding.  While it is true that the Court found that the Utah Installation infringes the '160 Patent, the Court did not find that the

---

[108] The courts agree.  *Walker v. City of Orem*, 451 F.3d 1139, 1155 (10th Cir. 2006) ("…plaintiff did not dispute most of the facts contained in the "statements of uncontroverted fact" accompanying defendants' motions for summary judgment. To the extent that these facts are undisputed, they must be deemed conceded for purposes of our inquiry."); *Clark v. Summit County Sheriff*, 507 F. Supp.2d 929, 932 (D. Utah 2007) ("To the extent that *Clark* did not controvert these facts, they must be deemed admitted for purposes of the summary judgment inquiry."); *SEC v. Merrill Scott & Associates*, 505 F. Supp. 2d 1193, 1199 and n. 2 (D. Utah 2007) (undisputed facts deemed established); *Transfac Capital, Inc. v. Celetano*, No. 2:11-cv-00899 DN, 2013 WL 3973242, at *1-*2 (D. Utah August 1, 2013) (undisputed facts deemed admitted  under local rule 56-1(c)); *Desai v. Panguitch Main Street, Inc.*, No. 2:04cv691, 2012 WL 5464954, at *1 n. 2 (D. Utah November 8, 2012) (movant's facts deemed admitted when non-movant failed to controvert facts set forth by movant); *Peterson v. U.S.*, No. 2:04-cv-962BSJ, 2006 WL 1184735, at *1 n. 1 (D. Utah May 2, 2006) (movant's facts deemed admitted when non-movant failed to controvert facts set forth by movant); *Brown v. Southern Utah University*, No. 2:08-cv-542-TC, 2010 WL 1417861, at *1 n. 5 (D. Utah April 6, 2010) (The facts were undisputed in part because non-movant failed to specifically dispute movant's statements of fact, and rule 56-1(c) was applied); *FDIC v. Phoenix Phones*, No. 1:10-cv-76 TS, 2011 WL 1775735, at *1 and n. 5 (D. Utah May 9, 2011) (Applying rule 56-1(c) in case where non-movant submitted nothing to controvert the facts.).

[109] A342 (DN 165, pg. 6 ¶ 10); A 387 (DN 178, pg. 13 lns. 8-15); A389 (DN 179 Amended Judgment without enjoining model Elegant)

Utah Installation was a model Elegant."[110]  There is no legal authority relied upon by the district court or any order of the district court requiring that all facts deemed admitted must be expressly adopted and restated a finding of the district court. Therefore, the district court's refusal to recognize the infringing Utah Installation as defendants' model Elegant is without basis in fact, law, rule or order of the district court.  The district court has abused its discretion in excluding defendants' model Elegant pool enclosure from the named, adjudicated infringing devices. This Court should reverse this conclusion of the district court and order (1) that defendants' model Elegant is an infringing device, (2) that the additional $450,000 of sales of the model Elegant be added to the already established $2,700,000 of infringing sales for purposes of computing damages under 35 U.S.C. § 284 and (3) that the model Elegant be added to the injunctive order and Amended Judgment of the district court.

### C.    The District Court's Non-Willfulness Finding is Clearly Erroneous.

This Court has declared the nature and review of issues related to willfulness.  In *Tegal Corp. v. Tokyo Electron America Inc.*, 257 F.3d 1331, 1350-51 (Fed. Cir. 2001), this Court has stated:

> A court's determination that infringement was willful is a finding of fact, reviewable under the clearly erroneous standard.  *Graco, Inc. v. Binks Mfg. Co.*, 60 F.3d 785, 792, 35 USPQ2d 1255, 1260 (Fed. Cir.

---

[110] A387 (DN 178, pg. 13 lns. 8-15)

1995). At trial, willfulness must be proven by clear and convincing evidence. *Embrex, Inc. v. Serv. Eng'g Corp.*, 216 F.3d 1343, 1350, 55 USPQ2d 1161, 1164 (Fed. Cir. 2000). 'The determination of whether a case is exceptional and, thus, eligible for an award of attorney fees under §§ 285 is . . . a factual determination reviewed for clear error.' *Cybor*, 138 F.3d at 1460, 46 USPQ2d at 1178 (citation omitted). The subsequent determination of whether attorney fees are appropriate is reviewed for an abuse of discretion. *Id.*

A finding of willfulness includes findings that (1) defendants were aware of the '160 Patent, (2) defendants acted despite an objectively high likelihood that its actions infringed a valid patent, and (3) the objectively high likelihood of infringement was either known or so obvious that it should have been known to defendants. This determination is made considering the totality of the circumstances.[111]

### 1.    Defendants Lacked a Substantial Defense Before the District Court's November 2011 Infringement Order

In this case, Aqua Shield sent defendants letters informing them about the '160 patent and their infringing conduct. The defendants chose to continue infringing without a license and to litigate. From 2005 to 2012 defendants never presented a substantial defense to infringement, including the defense that the asserted patent claims are all invalid.

---

[111] *In re Seagate Technology, LLC*, 497 F.3d 1360 (Fed. Cir. 2007) (en banc); *Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1347 (Fed. Cir. 2004) (en banc).

This was confirmed by the district court's findings in 2011 that defendants presented no substantial defense as to noninfringement[112] or as to invalidity (DN 87, page 8-10). Defendants presented absolutely no noninfringement evidence or arguments as to infringed claims 2-9, 11-14 and 16.[113] None.

Despite this lack of a substantial defense, the district court found that defendants had a good faith belief they did not infringe before the district court's November 2011 Infringement Order because the "the Eastern District of New York denied Aqua Shield's motion for preliminary injunction."[114] This finding is clearly erroneous.

First, defendants' defenses before the district court's 2011 Infringement Order (including at the time of the 2005 preliminary injunction proceeding) were the same insufficient defenses that defendants' presented to the court prior its 2011 Infringement Order. Simply having these defenses undecided before November 2011 does not make them any more substantial. Defendants never presented substantial defenses before the district court's November 2011 Infringement Order.

---

[112] A32-A37 (DN 87, pp 3-8)

[113] A32-A33 (DN 87, pg. 3 line 16 to pg. 4 line 5)

[114] A346, A378, A379 (DN 165, pg. 10 para. 20 and DN 178 pgs. 4-5)

Second, the New York district court made no findings as to noninfringement or invalidity.[115]

> ## 2. Defendants Lacked a Substantial Invalidity Defense After The District Court's November 2011 Infringement Order

In 2012, defendants also presented a prior art defense based on prior art already considered by Patent Office. Defendants' 2012 invalidity defenses lacked merit. The district court soundly rejected all of defendants' 2012 invalidity defenses because defendant had "not compared the construed claims of the '160 patent to the prior art," presented "no analysis of the Court's claim construction," as to anticipation defendants introduced no evidence showing that the prior art disclosed each claim element, "Defendants have not argued obviousness on a claim-by-claim basis" and "Defendants also do not try to show that all the elements of even a single claim in in the '160 patent were made obvious by prior art."[116] This invalidity defense of defendants after the district court's November 2011 Infringement Order was clearly meritless.

---

[115] A29, (2005 Hearing, pg. 29, lns. 2-4)

[116] A173-A233 (DN 129, pg. 9 ln. 9 to pg. 11 ln 14)

3.    The Clear and Convincing Evidence of Record
Establishes That Defendants Continued Their Infringing
Conduct Without Any Good Faith Product Redesign
After the District's Court's November 2011 Infringement
Order.

At the damage trial, defendants' shipping documents for each infringing pool enclosure imported into the United States established that the pool enclosure was shipped "dismantled in parts."[117]    This meant that the infringing pool enclosures were shipped in pieces and first assembled in the United States, including the attachment of removed end panels.[118]

Shipment and assembly of infringing pool enclosures "dismantled in parts" included shipments between October 2008 until the district court's November 2011 Infringment Order.[119]    These shipments between 2008 and 2011 were the infringing devices.

Shipment and assembly of infringing pool enclosures "dismantled in parts" continued unabated after the November 2011 Infringement Order through the district court's January 2013 order upholding the validity of the claims of the '160 patent.[120]

---

[117]    A173-A233 (Trial Exhibit HH comprising DN 172-2 through DN 172-4)

[118]    A242, A243, A246 (DN 152, pg. 266 lns. 14-23, pg. 268 lns. 12-16, pg. 273 lns. 7-9)

[119]    A265-A309 (DN 172-2)

[120]    A310-A326 (DN 172-3)

Shipment and assembly of infringing pool enclosures "dismantled in parts" again continued without ceasing after the district court's order upholding validity.[121]  This clear and convincing evidence from defendants' own documents and trial testimony establishes that there was no change to defendants' infringing conduct.

Nevertheless, the district court found that defendants had a reasonable belief that their pool enclosures did not infringe after the court's November 2011 Infringement Order because defendants attempted to design around the patented invention by fixing the end panels of their pool enclosures in place so the end panels were not removeable, that is, not dismantled in parts.[122]

To reach its design around conclusion the district court relied entirely upon a purported discussion between Mr. Stonkus and the Alukov defendants.  Mr. Stonkus said he "spoke to their design people as well as people in the office.  I had a lead person there and specifically directed them that we cannot ship into the United States any enclosures that have detachable faces.  So that was very clear to

---

[121] A327-A328 (DN 172-4)

[122] A346-A347 (DN 165, Finding of Fact no. 21, pgs. 10-11)

them.  We talked about how we would change that.  They felt certainly we're going to make them fixed, permanent faces."[123]

What defendants may have talked about and may have felt they were going to do and what defendants actually did are two different, inconsistent things. Defendants made no manufacturing or assembly change as to the infringing pool enclosures.   Defendants' shipping records reveal that no change was made in defendants' infringing conduct after the district court's November 2011 Infringement Order; defendants continued to manufacture, ship and assemble detachable, dismantled parts including detached faces just has they had before the November 2011 Infringement Order.  Without a change, the district court's finding that defendants "made a good faith effort to design around the '160 patent" is clearly erroneous.

The record comprises clear and convincing evidence of defendants' lack of a substantial, objective defense on which defendants could base a reasonable, good faith belief of noninfringement or invalidity.  Therefore, this Court should direct the district court to expand its judgment to include a finding of willfulness.

### D.    Increased Damages Should be Awarded to Aqua Shield

An award of enhanced damages is within the district court's sound discretion.[124]  This analysis requires looking to the totality of the circumstances,

---

[123] A347 (DN 165, pg. 11, lns. 1-7, citing Trial Transcript, 200:9-15); A379 (DN 178, pg. 5, lns. 7-8, citing DN 153 Trial Transcript, pg.79).

considering both aggravating and mitigating facts, before determining whether, and to what extent enhanced damages should be awarded.[125]

Section 284 requires a two-step process: first, the court must determine whether the infringer acted with culpability; and second, the court must determine whether, given the totality of the circumstances, damages should be enhanced.[126] "An act of willful infringement satisfies this culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award."[127]

In this matter, a finding of willfulness meets this first requirement. Accordingly, the first element of the test with respect to a potential award of enhanced damages has been satisfied.

---

[124] *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996)

[125] *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1274 (Fed. Cir. 1999). "The paramount determination in deciding to grant enhancement and the amount thereof is the egregiousness of the defendant's conduct based on all the facts and circumstances." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 826 (Fed. Cir. 1992), *superseded on other grounds per Hoechst Celanese Corp. v. BP Chems. Ltd.*, 78 F.3d 1575, 1578 (Fed. Cir. 1996)

[126] *Jurgens*, 80 F.3d at 1570.

[127] *Id.*

The remaining inquiry is whether, under the totality of the circumstances, enhanced damages are warranted.  In determining whether enhanced damages are appropriate, the factors set forth in *Read* are a useful guide.[128]

### 1.    Deliberate Copying

Defendants sold pool enclosures nearly identical to the patented pool enclosures.  Defendants have provided no evidence to support their position that their pool enclosures were was not the result of deliberate copying of Aqua Shield's patented product. Thus, defendants made and sold pool enclosures that copied the design of Aqua Shield's pool enclosures as well as its patented aspects. This favors increased damages.

### 2.    Investigation of Patent

Defendants did nothing to substantively investigate the scope and validity of the '160 Patent after becoming aware of it in 2005.  Defendants assert that they had seen an opinion from trial counsel, Mr. Coffey, but defendants did not rely upon it in the proceeding before the district court.

Defendants presented no substantial defense.

For these reasons, this factor supports an award of enhanced damages.

---

[128] *Read*, 970 F.2d at 827.

### 3.     Infringer's Behavior During the Litigation

Defendants' used a number of frivolous and dilatory litigation tactics. Defendants have withheld damage data from Aqua Shield and the Court.[129] Defendants have repeatedly asserted invalidating prior sales without providing any evidence or proof and then admitting the Defendants have none.[130]  Defendants have for years asserted noninfringement positions and failed to present even a prima facie case of non-infringement as to claims 1-14 and 16 of the '160 Patent. Defendants have likewise for years asserted invalidity of the asserted claims and utterly failed to present a prima facie case of invalidity as to any of the asserted claims.

Defendants disregarded the district court's orders to refrain from attempting to reopen infringement proceedings and to refrain from presenting damage evidence not previously provided before trial.  This unwarranted multiplication of proceedings has burdened Aqua Shield with attorney's fees since 2005.

Defendants concertedly entered the U.S. market in 2005 then through Pool & Spa in 2008 all the while undercutting Aqua Shield pricing and doing so with a

---

[129] Trial Transcript, 16:9 to 18:9; 46:13 to 47:14; 292:8 to 296:16.

[130] Trial Transcript, 203:16-17 (Defendants admit that the prior art asserted as invalidating did not have detachable end panels); 253:16-22 (no evidence of invalidating sales in U.S.).

purported fiscal loss each year.[131]   This reckless disregard for Aqua Shield's exclusive rights and for the corresponding U.S. market established by the patented inventions reveals defendants' utter disregard for the U.S. market, patents and the proceedings of the Courts.

This factor also supports an award of enhanced damages.

### 4.     Infringer's Size and Financial Condition

The Alukov defendants have openly boasted throughout this litigation that they sell over 2,000 pool enclosures world-wide each year. Pool & Spa generated at least $2,700,000 in infringing sales since entering the U.S. market in 2008.  The relevant inquiry is whether damages increased up to three times would be unduly prejudicial based on the infringers' overall size and financial condition, not the specific sales attributable to the infringing product. Here, defendants claim to sell many other noninfringing pool enclosures;  therefore it is safe to infer that defendants' profits are sufficiently large that jointly defendants can absorb an increased doubling or even potentially a trebling of a damage award without being unduly prejudiced. Thus, this factor provides a basis to enhanced damages.

---

[131] Trial Transcript, 48:22-25; 49:14-21 and 50:4-7 (Pool & Spa needed financial backing to stay in business).

5.    Duration of Misconduct

Defendants had written notice of the '160 Patent since August 2005. Defendants continued to sell infringing pool enclosures from at least 2008 through 2013 throughout the entire course of this litigation. Defendants' infringing conduct has been willful for the entire period of time. Thus, this factor supports an award of enhanced damages.

6.    Closeness of the Case

This was not a close case.  All of defendants' purported substantive defenses were found to be insufficient, complete or meritless.  All of defendants' asserted defenses were readily dispatched by the district court.  This factor favors enhanced damages.

7.    Remedial Actions Taken

Defendants took no remedial actions before or after the district court's November 2011 Infringement Order despite having knowledge of the '160 Patent and Plaintiff's infringement claims for many years. Defendants continued selling the infringing pool enclosures during the lawsuit. Because, defendants took no material steps to investigate the alleged infringement, and because Defendants continued to sell the accused product during the pendency of this litigation, this factor supports an enhancement of damages.

### 8.    Concealment by Infringer

Defendants concealed their infringing conduct by refusing to produce full and complete financial records.  Defendants tried to conceal ongoing infringement after the district court's November 2011 Infringement Order by representing that they had called for a redesign when in fact no redesign was effected. Defendants' concealment was also advanced by the Alukov defendants' failure to keep records from which damages could be calculated as infringing devices.   Similarly, defendants did not provide a witness who could provide the financial information Aqua Shield needed to properly assess defendants' profits.  Based on this conduct this factor supports an enhanced damages.

### 9.    Motivation for Harm

Defendants admitted they wanted to sell their infringing pool enclosures in the two-supplier U.S. market.[132]  This resulted in taking $2,700,000 of sales for the patented product away from Aqua Shield.  The district court found that Aqua

---

[132] A247 (DN 152, pg. 291 lns. 16-21)

Shield and defendants were direct competitors.[133]  Pool & Spa did so at a purported loss.[134]  Therefore, this factor supports a request for increased damages.

Weighing these factors reveals a need for increased damages.  The district court should be ordered to increase damages in favor of Aqua Shield.

For the same reasons, Aqua Shield should be awarded attorney fees.[135]

---

[133] *E.g., Fumi Elec. Co.*, 593 F. Supp. 2d at 1116-17 ("[W]here, as here, the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages.").

[134] *Domestic Fabrics Corp. v. Sears, Roebuck & Co.*, 326 F. Supp. 2d 694, 700 (E.D.N.C. 2004) ("A company intentionally undertaking the risk of importing infringing products and engaging in an aggressive strategy unsupported by competent advice of counsel is exactly the type of activity the increased damage reference in the patent law seeks to prevent.").

[135] *Cybor Corp. v. FAS Tech., Inc*., 138 F.3d 1448, 1460 (Fed. Cir. 1998) (en banc).

## CONCLUSION AND STATEMENT OF PRECISE RELIEF SOUGHT;

The district court improperly limited the amount of the reasonable royalty. The amount of the reasonable royalty should be expanded by the selected royalty rate multiplied by the selling price of the infringing pool enclosures.

The district court erred by failing to find willful infringement where over the course of about seven and one-half years of litigation defendants never relied upon or presented a substantial defense.

Based upon defendants' willful infringement and unreasonable litigation conduct, Aqua Shield should be awarded increased damages up to three times and reasonable attorney's fees.

The district court's judgment of infringement, damages, and injunctive relief should include defendants' model Elegant.

This Court should vacate the district court's judgment limiting a reasonable royalty amount to only $10,800.

This court should remand the matter to the district court with instruction to compute a reasonable royalty amount based on a 8% royalty rate percentage of $3,150,000 of infringing sales.

This Court should also reverse the district court's determination as to willfulness and declare that defendants lacked an objective, good faith basis and

belief as to a substantial defense of noninfringement or invalidity throughout the litigation.

This Court should instruct the district court to increase damages up to three time and award Aqua Shield attorney fees.

This Court should reverse the district court's failure to include the defendants' model Elegant as an adjudicated, infringing device for purposes of infringement, damages and injunctive relief.

DATED this 8th day of March, 2014.

KIRTON & McCONKIE

By: _____
Todd E. Zenger,

Attorney for Plaintiff-Appellants
Aqua Shield, Inc.

# **Addendum**

DN 179        Amended Judgment in a Civil Case

DN 178        Memorandum Decision and Order Granting in Part and Denying in Part Plaintiff's Rule 59 Motion to Alter

DN 166        Judgment in a Civil Case

DN 165        Findings of Fact and Conclusions of Law

USPN 6,637,160 to Brook, issued October 28, 2003

AO 450 (Rev 5/85) Judgment in a Civil Case

# United States District Court

Central Division for the District of Utah

2013 DEC -9 ⊃ 3: 56

BY:

**AMENDED**

**JUDGMENT IN A CIVIL CASE**

AQUA SHIELD,

v.

INTERPOOL POOL COVER TEAM,
ALUKOV HZ SPOL SRO, ALUKOV SPOL
SRO, and POOL & SPA ENCLOSURES,

Case Number: 2:09-cv-00013-TS

IT IS ORDERED AND ADJUDGED

that judgment be entered in favor of the plaintiff and against the defendant on plaintiff's claim
that the defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient
infringe claims 1-14 and 16 of the '160 Patent. Defendants Inter Pool Over Team, Alukov HZ
Spol.S.R.O. Alukov Spol.S.R.O., Pool and Spa Enclosures, their officers, agents, servants,
employees and attorneys, and those persons in active concert or participation with such
person(s) who receive actual notice of this order, by personal service or otherwise, shall be
permanently enjoined from infringing, either directly, by inducement, or by contribution, the
'160 Patent making using, selling or offering to sell the products adjudged to infringe in the
United States or importing into the United States the products adjudged to infringe or are not
more than colorably different from the adjudicated devices. The products adjudged to infringe
the '190 patents include the following pool cover models manufactured or offered for sale by
defendants: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient with generally
flat and removable end-panels.

Plaintiff is further awarded a reasonable royalty in the amount of $10,800.

| December 9, 2013 | D. Mark Jones |
|---|---|
| Date | Clerk of Court |

_(By) Deputy Clerk_

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC., A New York Corporation, | |
| Plaintiff, | MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFF'S RULE 59 MOTION TO ALTER JUDGMENT |
| vs. | |
| INTERPOOL COVER TEAM, ALUKOV HZ SPOL. S.R.O., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC, | Case No. 2:09-CV-13 TS |
| Defendants. | |

This matter is before the Court on Plaintiff's Rule 59 Motion to Alter Judgment.[1]  For the

reasons discussed below, the Court will grant Plaintiff's Motion to award a reasonable royalty

and to allow Plaintiff to seek costs, but will deny the Motion in all other respects.

---

[1]Docket No. 167.

I. BACKGROUND

On March 19–20, 2013, the Court held a two-day bench trial on this case.  This Court previously found that Defendants Inter Pool Cover Team, Alukov HZ Spol. S.R.O., Alukov, Spol. S.R.O., and Pool & Spa Enclosures, LLC (collectively "Defendants") infringed Plaintiff Aqua Shield Inc.'s ("Aqua Shield") patent, U.S. Patent No. 6,637,160 ("the '160 Patent").  The Court published Findings of Fact and Conclusions of Law[2] and ordered judgment in favor of Plaintiff on Plaintiff's claim that Defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient infringe claims 1–14 and 16 of the '160 Patent.  Further, the Court awarded zero damages and ordered a permanent injunction.  Plaintiff now seeks to amend the judgment to include (1) a finding of willfulness, (2) reasonable compensation, and (3) costs.

On November 18, 2013, the Court heard argument on Plaintiff's Motion.  During oral argument, Defendants introduced the case of *Unicom Monitoring, LLC v. Cencom, Inc.*[3]  Because the case was not referred to in the briefs, the Court granted Plaintiff ten days to respond to the case.  Plaintiff filed its Response.[4]  Defendants filed an Objection to the Response,[5] arguing that Plaintiff abused its privilege to respond to new authority by rehashing prior arguments and by making new arguments on how to calculate a reasonable royalty.  The Court considered both

---

[2]Docket No. 165.

[3]06-CV-1166 (MLC), 2013 WL 1704300 (D.N.J. April 19, 2013) (unpublished).

[4]Docket No. 175.

[5]Docket No. 177.

filings but found neither to be particularly helpful.  Further, *Unicom* is distinguishable because the record in that case did not reflect infringer's profits, as the record in this case does.

## II.  DISCUSSION

The purpose of a motion to alter or amend a judgment under Rule 59(e) of the Federal Rules of Civil Procedure "is to correct manifest errors of law or to present newly discovered evidence."[6]  "Grounds warranting a motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."[7]  Such a motion is an inappropriate vehicle to reargue an issue previously addressed by the court such as "when the motion merely advances new arguments, or supporting facts which were available at the time of the original motion."[8]

## A.    WILLFULNESS

Plaintiff argues that Defendants' infringement was willful.  Plaintiff cites no new evidence and no intervening change in controlling law, and instead argues that the Court misunderstood important facts and controlling law in determining that Defendants' infringement was not willful.

---

[6]*Webber v. Mefford*, 43 F.3d 1340, 1345 (10th Cir. 1994) (citation and internal quotation marks omitted).

[7]*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).

[8]*Id.*

The word willful "is generally understood to refer to conduct that is not merely negligent."[9]  A "[d]etermination of willfulness is made on consideration of the totality of the circumstances."[10]  Rigid rules do not control determinations of willfulness because the district court is in the best position to consider the evidence, the testimony, and the demeanor of witnesses.[11]  The standard for proving willfulness is "whether, under all the circumstances, a reasonable person would prudently conduct himself with any confidence that a court might hold the patent invalid or not infringed."[12]

Plaintiff argues that Defendants' conduct was willful because (1) Defendants did not rely on an opinion of patent counsel, (2) after the Court's infringement Order, Defendants continued to ship pool enclosures dismantled in parts, and (3) Defendants did not change their manufacturing and shipping practices until after the Court's infringement Order and validity ruling.

Plaintiff recycles the same arguments that it made at trial.  The Court found no willfulness because "[p]rior to the Court's Order on infringement, Defendants had a reasonable belief that their pool enclosures did not infringe the '160 Patent" and "[a]fter the Court's infringement Order, Defendants made a good faith effort to design around the '160 Patent."[13]

---

[9]*Knorr-Bremse Systeme Fuer Nutzfahrzeuge GmbH v. Dana Corp.*, 383 F.3d 1337, 1342 (Fed. Cir. 2004).

[10]*Id.*

[11]*Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986).

[12]*Ryco, Inc. v. Ag-Bag Corp.*, 857 F.2d 1418, 1428 (Fed. Cir. 1988).

[13]Docket No. 165, at 10.

Plaintiff presented evidence at trial that Defendants continued to import infringing products after the Court's infringement Order on November 28, 2011. This Court considered Plaintiff's evidence at trial and adequately addressed willfulness in its Findings of Fact and Conclusions of Law. Under the circumstances presented here, the Court finds that Defendants prudently conducted themselves with confidence that a court might hold the patent invalid or not infringed. Once there was a finding of infringement, Defendants made a good faith effort to design around the '160 Patent. After the Court's rulings on infringement and validity, Defendants modified their enclosures to permanently fix the end panels in place.[14] Thus, because Plaintiff merely repackages arguments that this Court has already rejected, the Court will deny Plaintiff's Motion to Alter Judgment on this ground.

B.     COMPENSATION

Plaintiff next argues that the Court erred by not awarding lost profits or a reasonable royalty. The Patent Act provides that upon a finding of infringement, a court "shall award . . . damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer."[15] A reasonable royalty is

> [t]he amount that a licensor (such as a patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain the license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to

---

[14]Docket No. 153, at 79.

[15]35 U.S.C. § 284 (2006).

make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.[16]

In seeking a reasonable royalty, the patentee bears the burden of proving legally sufficient evidence that supports the royalty sought.[17]  The Patent Act "requires the award of a reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."[18]

Plaintiff argues that the Court erred by not relying on the licensing negotiations that the parties conducted in 2009 ("the 2009 negotiations") to determine a reasonable royalty.  Plaintiff further argues that the Court erred by disregarding the damages testimony of Bob Brooks ("Brooks") who is the inventor of the '160 Patent and the president of Aqua Shield.  Finally, Plaintiff argues that the Court had sufficient information to determine a reasonable royalty even if the Court disregarded the 2009 negotiations and Brooks's testimony, because Defendants' profits on infringing sales were known.

1.    Negotiations

In 2009, the parties met to discuss licensing the '160 Patent to Defendants.  The 2009 negotiations ended without an agreement being reached.  Plaintiff argues that the Court erred by not considering the parties' 2009 negotiations in calculating a reasonable royalty.  Plaintiff cites to numerous cases out of the Federal Circuit that consider royalty rates offered in negotiations

---

[16]*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

[17]*Trell v. Marlee Elecs. Corp.*, 912 F.2d 1443, 1447 (Fed. Cir. 1990).

[18]*Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981), *aff'd on other grounds*, 461 U.S. 648 (1983).

during litigation.[19]  However, the United States Supreme Court has long held otherwise.[20]  One court has called the prohibition on using settlement negotiations during litigation to determine a reasonable royalty rate "a century-old rule."[21]

Even if it would be proper for the Court to consider the 2009 negotiations, the Court already found that the negotiations did not provide evidence of a reasonable royalty rate.  The Court found that the negotiations took place four years after this case began, the impetus for the negotiations was to avoid the costs of litigation, and the parties attempted to negotiate not only a licensing agreement, but an agreement that would allow Plaintiff to resell Defendants' products.  As the Court noted in its Conclusions of Law, the 2009 negotiations "do not provide evidence of a reasonable royalty rate."[22]  Therefore, the Court will deny Plaintiff's Motion on this ground.

2.     *Brooks's Testimony*

Plaintiff next argues that Brooks's testimony regarding damages was proper lay testimony and should not have been disregarded.  As stated in the Court's Conclusions of Law, the Court found Brooks's testimony regarding Aqua Shield's lost profits to be "not credible"[23] and even if

---

[19]*See, e.g.*, *ResQnet.com, Inc. v. Lansa*, 594 F.3d 860, 872 (Fed. Cir. 2010).

[20]*Rude v. Wescott*, 130 U.S. 152, 164 (1889); *Cornely v. Marckwald*, 131 U.S. 159, 161 (1889).

[21]*Wang Labs., Inc. v. Mitsubishi Elecs. Am. Inc.*, 860 F. Supp. 1448, 1452 (C.D. Cal. 1993).

[22]Docket No. 165, at 20.

[23]*Id.* at 16.

it were credible it was not "adequate to show lost profits."[24]  Numerous factors unrelated to the infringement were at play and these factors could have affected Plaintiff's profits.  Plaintiff failed to meet its burden to prove lost profits through Brooks's testimony.  The Court will not alter its judgment to award a reasonable royalty based on Brooks's testimony.

  3.  *Infringers' Profits*

  Plaintiff next argues that the Court had a statutory obligation to award a reasonable royalty and that the Court had sufficient information to calculate a reasonable royalty based on Defendants' profits.

  "In a normal negotiation, the potential licensee has three basic choices: forego all use of the invention; pay the agreed royalty; infringe the patent and risk litigation."[25]  To determine a reasonable royalty, the Court must assume that Defendants would have chosen the second option had they known in 2005 the patent was valid and their products infringed.  The Federal Circuit has stated that the Patent Act does not require a patentee to prove actual damages.  Ordinarily, the Court has an obligation to award a reasonable royalty when lost profits are not proven.[26]  However, "that does not mean that a patentee who puts on *little or no* satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not reasonable and therefore contravenes section 284."[27]  Only when the record is completely

---

[24]*Id.*

[25]*Fromson v. W. Litho Plate & Supply Co.*, 853 F.2d 1568, 1576 (Fed. Cir. 1988), *overruled on other grounds by Knorr-Bremse*, 383 F.3d 1337.

[26]35 U.S.C. § 284.

[27]*Dow Chem. Co.*, 341 F.3d at 1382 (emphasis added).

devoid of evidence from which the Court can determine a reasonable royalty, can the Court order an award of zero dollars.[28]  In its Findings of Fact and Conclusions of Law, the Court awarded zero dollars in damages.  However, the Court did not consider the infringer's profits to arrive at this conclusion.

"A reasonable royalty may . . . be based on the infringer's profits."[29]  Although a hypothetical license requires the royalty to be determined in light of anticipated profits when the infringement began, courts have held that evidence of subsequent actual profits is relevant to forming a judgment as to anticipated profits.[30]  "While a plaintiff in a patent infringement action is no longer entitled to recover profits derived by the sale of the infringing items, the infringer's profits may constitute evidence tending to show the plaintiff's damages or be a relevant factor in the calculation of a reasonable royalty."[31]  The Federal Circuit has held that a number of different methodologies can be employed for calculating a reasonable royalty including basing the royalty on a percentage of the infringer's gross or net profit, as a set amount per infringing product sold, or as a percentage of the gross or net price received for each infringing product.[32]

---

[28]*Compare Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) (emphasis added) (holding district court's award of zero damages to be error), *with Devex*, 667 F.2d at 363 (upholding district court's award of zero damages).

[29]*Linkco, Inc. v. Fujitsu Ltd.*, 232 F. Supp. 2d 182, 190 (S.D.N.Y. 2002).

[30]*See, e.g.*, *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Deriick Co.*, 895 F.2d 1404, 1404–06 (Fed. Cir. 1990).

[31]*Jenn-Air Corp. v. Penn Ventilator Co., Inc.*, 394 F. Supp. 665, 675 (E.D. Pa. 1975).

[32]*Fromson*, 853 F.2d at 1578.

The Federal Circuit, in discussing its holding in *Lindemann Maschinenfabrik GmbH v. American Hoist & Derrick Co.*, noted that the case "supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation."[33]  In *Lindemann*, the district court awarded plaintiff $10,000 as a reasonable royalty.[34]  Because plaintiff failed to produce sufficient evidence of damages, the court used defendant's profit margin as a tool for determining a reasonable royalty.[35]  The court noted that "[i]n view of the sparse and totally inadequate record [plaintiff] created at trial, we cannot say that [plaintiff] proved entitlement to an award greater than $10,000."[36]

Plaintiff argues that it submitted the underlying profit and loss statements for each infringing sale[37] and that the Court need only do simple arithmetic in order to arrive at a reasonable royalty rate based on these net profit figures.  Plaintiff further contends that Defendants' net profit on infringing sales ranged from 12% to 39%.[38]  The Court cannot rely on these figures as representing net profits because—while the financial records reflect transaction costs associated with infringing sales—they do not reflect overhead costs across the company.

---

[33]*Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1385 (Fed. Cir. 2001).

[34]*Lindemann*, 895 F.2d at 1404.

[35]*Id.*

[36]*Id.* at 1408.

[37]Docket No. 167 Ex. 4; *see also* Trial Ex. DD.

[38]Docket No. 167 Ex. 4.

10

The figure that Plaintiff labels "gross profit" represents total sales income on each infringing pool cover. The figure that Plaintiff labels "net profit" represents the "gross profit" figure minus "cost of goods sold" and "additional expenses" relating to installing the particular infringing pool cover.[39] This figure does not represent a credible net profit figure because it reflects only transaction expenses related to the sale of each individual infringing cover. It does not reflect company-wide salaries or non-transaction related overhead. Thus, the percentages that Plaintiff cites are not accurate net profit figures. The Court, therefore, cannot rely on these figures to represent Defendants' net profit in determining a reasonable royalty.

The record contains additional information related to Defendants' profits. Alexander Stonkus ("Stonkus"), the CEO of Pool & Spa Enclosures, LLC ("P&S"), testified that gross revenue on infringing sales was $2,700,000, that gross profit on infringing sales was just over $600,000, and ultimately the net profit margin on infringing sales was approximately 5%.[40] Jan Zitko, the president of Inter Pool Cover Team corroborated these figures, noting that the Alukov has a yearly corporate net profit on all sales after taxation that is between 5% and 8%.[41] He also noted that profit may be less than that on sales in the United States.[42] Stonkus similarly testified that Alukov's profit margin on all sales—which is 5%—is no different from its profit margin on

---

[39]*Id.*

[40]Docket No. 152, at 228–29.

[41]*Id.* at 293

[42]*Id.* at 302.

infringing sales.[43]  Alexander Stonkus also testified that P&S has operated at a loss since it began.[44]  Utilizing the information above, the Court finds that Defendants' profits on infringing sales is 5%.  This yields a net profit on infringing sales of $135,000.

The Court found that the '160 Patent has several advantages over pool covers that do not utilize the '160 Patent.  The patented pool covers are easier to construct, are more aerodynamic, have a higher snow-load capacity, and are more leak-proof than other square or boxy pool covers.  Considering these benefits, while still allowing Defendants a profit on infringing sales, requires the Court to use its best ability to estimate what Defendants would have likely paid for the patented design.

In a willing negotiation between the parties at the time infringement began, in order to enjoy the advantages of the patent that the Court noted, the Court finds that Defendants would have been willing to pay 5% of their net profits on infringing sales as a reasonable royalty to avoid infringement.  As explained in the Findings of Fact and Conclusions of Law, six of the *Georgia-Pacific* factors weigh in favor of a higher royalty, therefore, the Court finds this number should be adjusted upward to 8%.  This results in a royalty of $10,800.

In a hypothetical negotiation, the Court finds Defendants would not have paid more for the license because they would have likely gone without the benefits of the '160 Patent and designed around it, as they have done now.  Based on the preceding discussion, the Court finds

---

[43]*Id.* at 230.

[44]*Id.*

that the parties, at the outset of this litigation, would have negotiated a reasonable royalty of 8% of Defendants' net profits, or $10,800.

In this case, like in *Lindemann*, Plaintiff did not adequately meet its burden. Plaintiff "bore the burden and yet failed to adduce evidence dictating a particular amount, [and] left the [judge] with the widest range of choice."[45] However, because the statute is quite clear that the Court "shall" award damages "in no event less than a reasonable royalty,"[46] the Court will alter its Judgment to award a reasonable royalty as stated above.

### 4.    Model Elegant

Plaintiff also argues that $450,000 of revenue from the model Elegant should be added to the $2,700,000 of sales the Court already found to infringe. In support, Plaintiff argues that the Utah Installation, which the Court found to infringe, was a model Elegant. Although Brooks averred that the Elegant was the model installed in Syracuse, Utah, the Court never adopted such a finding. While it is true that the Court found that the Utah Installation infringes the '160 Patent, the Court did not find that the Utah Installation was a model Elegant. The Findings of Fact and Conclusions of Law adequately addresses the Model Elegant and will not be disturbed.

### C.    COSTS

The Patent Act provides that the Court should award the prevailing party "interest and costs as fixed by the court."[47] Plaintiff argues that the Findings of Fact and Conclusions of Law

---

[45]*Lindemann*, 895 F.2d at 1406.

[46]35 U.S.C. § 284.

[47]*Id.*

13

failed to award costs to Plaintiff. Aqua Shield has yet to file a motion for costs and the Court has

no information as to the extent of Plaintiff's costs. Plaintiff may seek an award of costs under 35

U.S.C. § 284, but the Court will not amend the Judgment to award a set sum at this time.

### III. CONCLUSION

It is therefore

ORDERED that Plaintiff's Motion to Alter Judgment (Docket No. 167) is GRANTED IN

PART AND DENIED IN PART. The Court grants the Motion to award Plaintiff a reasonable

royalty of $10,800. The Court further grants the Motion to allow Plaintiff to seek an award of

costs. The Motion is denied in all other respects.

The Clerk of the Court is directed to amend the Judgment (Docket No. 166) to award a

reasonable royalty to Plaintiff in the amount of $10,800.

DATED   December 9, 2013.

BY THE COURT:

_____

TED STEWART
United States District Judge

14

AO 450 (Rev.5/85) Judgment in a Civil Case

# United States District Court

Central Division for the District of Utah  2013 AUG 14  P 4: 30

DISTRICT OF UTAH

BY: DEPUTY CLERK

AQUA SHIELD,

v.

INTERPOOL POOL COVER TEAM,
ALUKOV HZ SPOL SRO, ALUKOV SPOL
SRO, and POOL & SPA ENCLOSURES,

**JUDGMENT IN A CIVIL CASE**

Case Number: 2:09-cv-00013-TS-DBP

This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

IT IS ORDERED AND ADJUDGED

that judgment be entered in favor of the plaintiff and against the defendants on plaintiff's claim that defendants' models Universe, laguna, Tropea, Combi, Style, Veranda, Spa and Orient infringe claims 1-14 and 16 of the '160 Patent. Defendants Inter Pool Cover Team, Alukov HZ Spol.S.R.O., Alukov Spol.S.R.O., Pool & Spa Enclosures, their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with such person(s) who receive actual notice or this order by personal service or otherwise, shall be permanently enjoined from infringing, either directly, by inducement, or by contribution, the '160 Patent making, using, selling, or offering to sell the products adjudged to infringe in the United States or importing into the United States the products adjudged to infringe or not more than colorably different from the adjudicated devices. The products adjudged to infringe the '160 Patent include the following pool cover models manufactured or offered for sale by defendants: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient with generally flat and removable end-panels.

| | |
|---|---|
| August 14, 2013 | D. Mark Jones |
| *Date* | *Clerk of Court* |
| | |
| | *(By) Deputy Clerk* |

IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| AQUA SHIELD, INC. a New York Corporation, | FINDINGS OF FACT AND CONCLUSIONS OF LAW |
| Plaintiff, | |
| vs. | Case No. 2:09-CV-13 TS |
| INTER POOL COVER TEAM, ALUKOV HZ SPOL. S.R.O., ALUKOV, SPOL. S.R.O., POOL & SPA ENCLOSURES, LLC, | |
| Defendants. | |

This matter came before the Court for trial from March 19, 2013, through March 20, 2013. Having heard the evidence presented at trial, reviewed the materials submitted by the parties, and being otherwise fully informed, the Court makes the following findings of fact and conclusions of law.

## I.  INTRODUCTION

This case concerns Plaintiff's allegations that Defendants infringed Plaintiff's patent, U.S. Patent No. 6,637,160 (the "'160 Patent" or the "Patent"). The Court previously determined that Defendants infringed Claims 1–14 and Claim 16 of the '160 Patent, and that the Patent is

valid.[1]  The issues that remain to be determined are: (1) the amount of damages, if any, to be

awarded to Plaintiff; (2) whether Plaintiff is entitled to attorney fees; (3) whether Defendants

induced infringement of the '160 Patent; (4) whether Defendants' infringement was willful; and

(5) whether Plaintiff is entitled to a permanent injunction.[2]

## II.  FINDINGS OF FACT

A.    THE PARTIES

1.    Aqua Shield, Inc. ("Aqua Shield") is the Plaintiff in this case.

2.    The defending parties are Inter Pool Cover Team ("IPC"); Alukov HZ Spol. S.R.O.,

Alukov, Spol. S.R.O., (jointly referred to as "Alukov"); and Pool & Spa Enclosures, LLC

("Pool & Spa").  The defending parties are referred to collectively as "Defendants."

3.    At trial, the Court heard testimony from three individuals: Bob Brooks, the inventor of

the '160 Patent and the president of Aqua Shield;[3] Alexander Stonkus, the CEO of Pool

& Spa and a representative of all Defendants in this case;[4] and Jan Zitko, the president of

IPC and the CEO of Alukov.[5]

---

[1]Docket Nos. 87, 129.

[2]Although Plaintiff's Amended Complaint also alleges a claim for unfair competition, the Court will deny this claim as Plaintiff did not assert it at trial or in its Proposed Findings of Fact and Conclusions of Law.

[3]Trial Tr. 99:5–15, March 19–20, 2013.

[4]*Id.* at 12:6–15, 24:5–7, 94:19–2.

[5]*Id.* at 289:13–17, 289:25–290:2.

B.    THE '160 PATENT

4.    The '160 Patent was filed July 10, 2001, and expires on July 10, 2021.[6]

5.    The '160 Patent contains one independent claim (Claim 1) and fifteen dependent claims

(Claims 2 through 16).  These claims are reproduced below:

1.  An apparatus for providing an enclosure for attachment to a building or for covering an area, comprising:
   (a) a plurality of arcuate panels, said panels having a first and second end, and a first and second side wherein said panels are generally rectangular, planar panels;
   (b) a plurality of arcuate frame members, said frame members having a first and second end, and a first and second side for receiving said panels, and an inner and an outer surface;
   (c) a pair of end panels for attachment to the ends of the enclosure to complete the enclosure;
   (d) means-for [sic] a plurality of horizontal frame members whereby the ends of the arcuate frame members are secured;
   (e) means for a plurality of rollers disposed on said horizontal frame members whereby said horizontal frame members are movable thereon;
   (f) means for a plurality of horizontal rails whereby the rollers are rollable thereon and the rails are able to be attached to a foundation; and,
   (g) wherein said plurality of arcuate panels and said plurality of arcuate frame members are sized so that arcuate panels and arcuate frame members of smaller diameter are disposed toward the interior of said panels and frame members of larger diameter so that said panels and frame members are able to telescope one within each other, wherein said arcuate panels approximate the shape of one of a circumference of half a circle or one-fourth an ellipse and said end panels are generally flat and removable.
2.  The apparatus of claim 1, wherein said arcuate panels approximate the shape of the circumference of half an ellipse.
3.  The apparatus of claim 2, wherein said plurality of arcuate frame members further comprise a generally rectangular shaped housing having a pair of horizontally disposed U-shaped receptacles on said outer surface thereof for receiving said first and second sides of said arcuate panels and an inwardly extending flap disposed on said inner surface.

---

[6]Docket No. 163, at 18; Docket No. 164, at 8 n.1.

4.  The apparatus of claim 3, herein [sic] said rectangular shaped housing has a slot therein, said slot disposed on said inner surface thereof for receiving said flap.

5.  The apparatus of claim 4, herein [sic] said means for a plurality of horizontal frame members further comprise a downwardly disposed U-shaped frame having a plurality of rollers disposed internal said U-shaped frame, said rollers being used for contacting said means for a plurality of horizontal rails.

6.  The apparatus of claim 5, wherein said U-shaped frame further comprises a downwardly disposed anchor plate thereon for contacting the rails.

7.  The apparatus of claim 6, wherein said anchor plate further comprises a hook disposed on the lower end of said anchor plate.

8.  The apparatus of claim 7, wherein said U-shaped frame further comprising an upwardly disposed U-shaped receptacle thereon for receiving said first end of said arcuate panels.

9.  The apparatus of claim 8, said means for a plurality of horizontal rails further comprise a base plate upon which plate said rails are mounted and said rails are attached to a foundation.

10.  The apparatus of claim 9, wherein said rail has an enlarged, exposed edge for receiving said hook of said anchor plate so that said anchor plate is secured to said rail.

11.  The apparatus of claim 10, further comprising means for adding additional rails to said rail base plate whereby the number of rails varies.

12.  The apparatus of claim 11, wherein said means for adding additional rails further comprises a slot disposed in the edge of said base plate for receiving the edge of another base plate.

13.  Then [sic] apparatus of claim 12, further comprising a stop rod and an end plug disposed in the end of said rail.

14.  The apparatus of claim 13, further comprising a cover for being placed over the tops of said rails and a spacer for being placed between said rails to enable one to walk over said rails.

15.  The apparatus of claim 4 [sic], further comprising a plurality of hooks and straps for securing said arcuate panels to said arcuate frame members.

16.  The apparatus of claim 15, wherein said arcuate panels are transparent.[7]

---

[7]Trial Ex. 1.

6.   The '160 Patent teaches a device that has several advantages over other pool covers.  The

patented pool covers are easier to construct, are more aerodynamic, have a higher snow-

load capacity, and are more leak-proof than other square, or "boxy" pool covers.[8]

C.   PROCEDURAL HISTORY

7.   Plaintiff filed this action on October 18, 2005, in the Federal District Court for the

Eastern District of New York.[9]  That same day, Plaintiff moved for a preliminary

injunction preventing Defendants from "infringing upon the '160 Patent, in general, and

exhibiting IPC's enclosures at the Pool & Spa Expo, in particular . . . ."[10]  The court

denied Plaintiff's motion on October 25, 2005.[11]

8.   On January 7, 2009, this matter was transferred to this Court pursuant to 28 U.S.C. §

1406.[12]

9.   On April 19, 2011, Aqua Shield moved for partial summary judgment, arguing that

Defendants had infringed the '160 Patent by selling an infringing pool cover (the "Utah

Installation") to a Utah resident.[13]  Aqua Shield also argued that several other pool cover

models advertised by Defendants infringed the Patent.  On November 28, 2011, the Court

---

[8]Trial Tr. 101:11–25, 118:14–20, 118:21–25, 212:5–7.

[9]Docket No. 2-2, at 1.

[10]Docket No. 2-4, at 7.

[11]Docket No. 3-9, at 1.

[12]Docket No. 1, at 5.

[13]Docket No. 59.

5

granted the motion in part, finding that Defendants infringed Claims 1–14 and 16 of the '160 Patent by selling the Utah Installation. The Court further found that the following pool enclosure models sold by Defendants also infringed Claims 1–14 and 16 of the Patent: Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient (the "infringing models" or "infringing pool covers").[14]

10.    Aqua Shield asserts that the Court's August 19, 2011 Order also found that Defendants' model Elegant pool cover infringes the '160 Patent. In support of this argument, Aqua Shield states that the Utah Installation was a model Elegant pool cover and because the Court determined that the Utah Installation infringes the '160 Patent, all model Elegant pool covers infringe the '160 Patent. Plaintiff, however, has never sought a determination that the Utah Installation was a model Elegant pool cover. Rather, in its motion for summary judgment on infringement, Plaintiff sought only a determination that the Utah Installation infringed the '160 Patent. Therefore, in its corresponding Order on summary judgment, the Court determined only that the Utah Installation infringes the '160 Patent, not that the model Elegant is an infringing model.

11.    On November 21, 2012, the parties filed cross-motions for summary judgment regarding the validity of the '160 Patent.[15] On January 15, 2013, the Court granted summary

---

[14]Docket No. 87, at 8, 11.

[15]Docket Nos. 117, 118.

judgment in favor of Plaintiff and against Defendants, finding that Defendants had not

overcome the '160 Patent's presumed validity.[16]

D.    POOL COVERS

12.    Plaintiff and Defendants appear to be the only companies in the United States that sell the

arched, telescoping, non "boxy" pool enclosures taught by the '160 Patent.  Mr. Brooks

testified that it is and always has been Aqua Shield's policy to not license the '160

Patent.[17]  He also testified that he sent cease and desist letters to any company that he

believed was advertising or offering for sale enclosures that infringed the '160 Patent.[18]

Each company that received a cease and desist letter quickly complied with it.[19]

13.    Defendants argue that the pool covers they sell differ in important ways from those sold

by Aqua Shield.  For example, while Aqua Shield does not install any of its pool

enclosures for its customers,[20] Alukov flies its employees from Europe to the United

States to provide factory installation of all their pool enclosures.[21]  Additionally, while the

majority of Aqua Shield's enclosures are not custom-manufactured to the customers'

---

[16]Docket No. 129, at 12.

[17]Trial Tr. 153:8–15.

[18]*Id.* at 102:17–105:18.

[19]*Id.* at 105:8–15, 170:4–12.

[20]*Id.* at 137:22–24.

[21]*Id.* at 209:24–210:4; Docket No. 164, at 13.

specifications,[22] the majority of Defendants' are.[23]  Finally, Defendants' pool enclosures,

on average, are more expensive than those sold by Aqua Shield.[24]

14.  Defendants argue that this evidence shows that the parties' products are not in

competition with one another.  As a result, Defendants' assert that their infringement has

not harmed Plaintiff.  The Court disagrees.

15.  Mr. Stonkus testified that he

> deal[s] with . . . competitors even today, whether it's Roll-A-Cover,
> Libart, DynaDome.  In my business I lose business to them.  Even though,
> you know, they might be a box enclosure as has been referred to, I lose
> business and they buy their enclosures over my enclosures every week.  I
> get calls from customers who say, hey, I'm looking at DynaDome, I'm
> looking at a Roll-A-Cover, I'm looking at Libart enclosure, you know,
> what's the difference between yours.  We talk about the design and the
> layout and so on, but at the end of the day all these guys have been in
> business . . . and I compete with them every single day."[25]

If DynaDome, Roll-A-Cover, and Libart (who all sell "boxy" pool enclosures not offered

by Defendants) are Defendants' competitors and Defendants lose business to them, then it

follows that Aqua Shield (who sells the same arched, telescoping enclosures Defendants

do) is also in direct competition with Defendants.

---

[22]Trial Tr. 162:1–8.

[23]*Id.* at 208:4–14.

[24]*Id.* at 207:7–15.

[25]*Id.* at 196:8–20.

16.    Mr. Brooks' testimony also supports this conclusion.  In addition to his repeated

statements that Defendants are his competitors,[26] Mr. Brooks also testified that Aqua

Shield receives calls from potential customers who state that they "could get similar

product from" Defendants.[27]

E.    DEFENDANTS' SALES

17.    Pool & Spa was formed on March 29, 2007, and began selling pool enclosures in 2008.[28]

The purpose of establishing Pool & Spa in the United States was to "sell the models of

pool enclosures manufactured by [Alukov] and promoted by the IPC Team . . . ."[29]

18.    On July 19, 2005, Alukov and IPC sold an infringing pool cover to Sunshine Pool

Products, located in Clearfield, Utah, for $9,000.[30]  Sunshine Pool Products was the

purchaser and end user of the Utah Installation.[31]  Since the Utah Installation, neither IPC

nor Alukov has made any sales of pool enclosures within the United States other than to

Pool & Spa.[32]

---

[26]*Id.* at 118:4–6, 119:19–22, 120:12–13, 130:20–24, 132:2–5, 147:1–2, 150:19–20, 168:12–18, 181:22–23.

[27]*Id.* at 116:7–13.

[28]Trial Ex. H, at 1; Trial Tr. 32:9–14.

[29]Trial Tr. 32:18–22.

[30]Trial Ex. GG, at 1; Trial Tr. 32:15–17, 228:15–21.

[31]Trial Tr. 57:7–9.

[32]*Id.* at 200:22–201:11.

19. From 2008 to 2013, Pool & Spa sold seventy-four infringing pool covers, generating $2,700,000 in gross sales revenue.[33]

F.    WILLFULNESS

20. Prior to the Court's Order on infringement, Defendants had a reasonable belief that their pool enclosures did not infringe the '160 Patent.  Although Defendants' did not rely on an opinion letter from counsel that their products did not infringe,[34] Mr. Stonkus testified that Defendants believed that their products did not infringe because the Eastern District of New York denied Aqua Shield's motion for preliminary injunction.  He said that "[b]asically the judge had made a ruling and [Aqua Shield] had [sought a] preliminary injunction so that we [would] not sell.  The judge ruled, sorry, he didn't accept it, so we continued to sell and market our enclosures."[35]  Based on this evidence, the Court finds that prior to the Court's order on infringement, Defendants' reasonably believed that their products did not infringe the '160 Patent.

21. After the Court's infringement Order, Defendants made a good faith effort to design around the '160 Patent.  Claim 1 of the '160 Patent teaches a device with "end panels [that] are generally flat and removable."[36]  Defendants attempted to design around this element by fixing the end panels of their pool enclosures in place so that they would no

---

[33]Trial Ex. DD, at 1–3; Trial Tr. 14:23–15:5, 228:9–12.

[34]Trial Tr. 88:14–17.

[35]*Id.* at 199:17–20.

[36]Trial Ex. 1.

longer be removable.  Mr. Stonkus testified that after the Court's ruling on infringement

he contacted Defendants' factory in the Czech Republic, and

> spoke to their design people as well as people in the office.  I had a lead
> person there and specifically directed them that we cannot ship into the
> United States any enclosures that have detachable faces.  So that was very
> clear to them.  We talked about how we would change that.  They felt
> certainly we're going to make them fixed, permanent faces.[37]

Defendants thereafter modified their enclosures to permanently fix the end panels in

place.[38]  The Court finds that this evidence shows that Defendants made a good faith

effort to design around the '160 Patent.

G.    AQUA SHIELD'S PROFIT MARGIN

22.    Neither party offered expert testimony regarding lost profits.

23.    Plaintiff relies on the testimony of Mr. Brooks to support its claim for lost profits.  Mr.

Brooks testified that before Defendants entered the market, Aqua Shield enjoyed a profit

margin of between 35 and 45 percent.[39]  After Defendants began competing in the U.S.

market, Aqua Shield's profit margin fell to its current rate of "ten to 15 percent max."[40]

With regard to fixed costs, Mr. Brooks testified that Aqua Shield could have produced an

---

[37]Trial Tr. 200:9–15.

[38]*See id.* at 203:9–20.

[39]*Id.* at 111:13–18.

[40]*Id.* at 113:14.

11

additional 25 to 50 pool covers per year without incurring additional costs for personnel, building, or equipment.[41]

24.     Mr. Brooks conceded that at the same time Aqua Shield was allegedly losing profits due to Defendants' infringement, Aqua Shield was also experiencing increased costs of production.  When asked whether Aqua Shield's expenses increased or decreased after Defendants entered the market, Mr. Brooks testified: "Rent goes up.  Aluminum goes up. Glazing—polycarbonate glazing goes up.  Payroll goes up."[42]

25.     The Court finds that Mr. Brooks' testimony regarding profit margins and fixed costs is not credible.  Plaintiff introduced no financial records to corroborate Mr. Brooks' testimony, and Mr. Brooks refused to testify regarding the foundation for his various estimates.  In the absence of any evidentiary support, the Court will not rely on Mr. Brooks' naked assertions as to Aqua Shield's financial affairs.

H.     2009 LICENSING DISCUSSIONS

26.     In early 2009, Mr. Brooks met with Mr. Stonkus and Mr. Zitko to discuss licensing the '160 Patent to Defendants.[43]  Mr. Zitko testified that his interest in licensing the Patent arose out of his desire to avoid further litigation with Aqua Shield.  Specifically, he

---

[41]*Id.* at 113:18–114:7.

[42]*Id.* at 115:23–25.

[43]*Id.* at 303:9–12.

stated: "I prepare royalty fee for you to stop—to stop—to stop this invoicing from the lawyer."[44]

27.    In addition to granting Defendants the right to manufacture and sell products covered by the '160 Patent, the parties also appeared to believe that the agreement would give Aqua Shield the right to resell a number of Defendants' noninfringing products.[45]  Ultimately, however, the negotiations failed and no agreement was reached.[46]

### III.  CONCLUSIONS OF LAW

28.    As stated, before the Court are the following issues of law: (1) the amount of damages, if any, to be awarded to Plaintiff; (2) whether Plaintiff is entitled to attorney fees; (3) whether Defendants induced infringement of the '160 Patent; (4) whether Defendants' infringement was willful; and (5) whether Plaintiff is entitled to a permanent injunction.

### A.    DAMAGES

29.    Plaintiff claims that it is entitled to damages in the form of either lost profits or a reasonable royalty on Defendants' infringing sales.

#### 1.    LOST PROFITS

30.    To receive an award of lost profits, Aqua Shield must show that "but for" the infringement, it would have made the additional profits enjoyed by Defendant.[47]  "A

---

[44]*Id.* at 140:16–22.

[45]*See id.* at 153:2–20, 240:8–12.

[46]*Id.* at 145:25–146:2, 308:2–13.

[47]*Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1122 (Fed. Cir. 2003).

patentee may resort to any method of showing, with reasonable probability, entitlement to lost profits 'but for' the infringement."[48] "The *Panduit* and two-supplier market tests are recognized methods of showing 'but for' causation."[49] In this case, Plaintiff attempts to show entitlement to lost profits through both the *Panduit* test and the two-supplier market test.

31.    The *Panduit* test requires that the patentee establish: "(1) demand for the patented product, (2) absence of acceptable noninfringing substitutes, (3) his manufacturing and marketing capability to exploit the demand, and (4) the amount of the profit he would have made."[50]

32.    The two-supplier market test requires that the patentee show "1) the relevant market contains only two suppliers, 2) its own manufacturing and marketing capability to make the sales that were diverted to the infringer, and 3) the amount of profit it would have made from these diverted sales."[51]

33.    As both tests require Plaintiff to prove the amount of profit it would have made, and that factor is determinative of the issue of lost profits in this case, the Court will limit its analysis to that factor.

---

[48]*Id.*

[49]*Id.*

[50]*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

[51]*Micro Chem.*, 318 F.3d at 1124.

14

34.    To establish the amount of profit it would have made, Plaintiff must introduce evidence of its profit margin, as well as evidence of any other factors that affect its profits and losses, including fixed and variable costs.[52]  Although Plaintiff need not prove the amount of profit he would have made with mathematical precision, damages may "not be determined by mere speculation or guess."[53]

35.    Plaintiff argues that it is entitled to lost profits due to lost sales and price erosion.  Its claim for lost profits based on lost sales is supported only by the testimony of Mr. Brooks.  As stated, however, Mr. Brooks' testimony regarding Aqua Shield's profit margin and fixed and variable costs is not credible.  Plaintiff offers no other evidence regarding its profit margin or the factors affecting it.

36.    Plaintiff's evidence regarding lost profits for price erosion is similarly inadequate.  To establish lost profits due to price erosion, Plaintiff has the "burden . . . to show that 'but for' infringement, it would have sold its product at higher prices."[54]  Among other things,

---

[52]See Oiness v. Walgreen Co., 88 F.3d 1025, 1030 (Fed. Cir. 1996) ("Instead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time, [the patent owner] invites the jury to engage in rapt speculation."); Panduit Corp., 575 F.2d at 1156 ("Panduit's Achilles heel on element (4) is a lack of evidence of its fixed costs."); John M. Skenyon et al., Patent Damages Law & Practice § 2:28 (2012) ("It is imperative in making a case of lost profits to present proof of all factors that affect profits and losses, including fixed and variable costs.").

[53]Oiness, 88 F.3d at 1030 (quoting Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555 (1931)).

[54]Crystal Semiconductor Corp. v. TriTech Microelectronics Int'l, Inc., 246 F.3d 1336, 1357 (Fed. Cir. 2001).

"[a] credible but-for analysis must account for the 'effect of [a] higher price on demand for the product.'"[55]

37.    "Instead of presenting evidence of actual sales combined with reliable economic analysis of demand, supply, and price over time,"[56] Aqua Shield simply restates the same inadequate basis it attests is sufficient to establish lost profits due to lost sales.  Plaintiff notes that Mr. Brooks testified that prior to Defendants' entry into the United States market, Aqua Shield enjoyed a 35 to 45 percent profit margin,[57] but that it fell to 10 to 15 percent once Aqua Shield had to compete with Defendants.[58]  As stated, this testimony is not credible.  Even if it were, however, it would not be adequate to show lost profits due to price erosion.  According to Plaintiff, Aqua Shield's reduced profit margin is due to "Defendant's entry into the market *and* [Aqua Shield's] artificial price erosion."[59] Plaintiff makes no effort to determine which portion of its lost profit is due to lost sales, which is due to Aqua Shield's reduced price, and which is due to other factors, such as Aqua Shield's admitted increasing costs of production.[60]  Additionally, Aqua Shield fails

---

[55]*SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1381 (Fed. Cir. 2013) (quoting *Crystal Semiconductor Corp.*, 246 F.3d at 1357).

[56]*See Oiness*, 88 F.3d at 1030.

[57]Trial Tr. 111:13–18.

[58]*Id.* at 113:14.

[59]Docket No. 163, at 14 (emphasis added).

[60]Trial Tr. 115:20–25.

16

to account for the effect an increased price would have had on the demand for its product. Finally, Aqua Shield has not adequately addressed whether the general decline in the housing market in late 2008 was also responsible for a portion of its reduced profits. Although Mr. Brooks testified that he believed the market downturn would not affect Aqua Shield's sales because Aqua Shield is the "Kia" of the pool enclosure market,[61] the Court cannot accept this self-serving testimony in the absence of other evidence to support it.

38.     Based as it is on insubstantial evidence, the Court will deny Plaintiff's claim for damages due to lost profits.

2.      REASONABLE ROYALTY

39.     Upon a finding of patent infringement, a court is required by statute to "award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court."[62]  However, where a patentee has put on no satisfactory evidence of a reasonable royalty rate, a court cannot award such damages.[63]

---

[61]*Id.* at 158:22–159:8.

[62]35 U.S.C. § 284.

[63]*See Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1382 (Fed. Cir. 2003) ("[T]he district court's obligation to award some amount of damages does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable' and therefore contravenes section 284.") (citation and internal quotation marks omitted); *Devex Corp. v. Gen. Motors Corp.*, 667 F.2d 347, 363 (3d Cir. 1981) ("The statute [35 U.S.C. § 284] requires the award of a

40.     A reasonable royalty is the amount that "a person, desiring to manufacture [, use, or] sell a patented article, as a business proposition, would be willing to pay as a royalty and yet be able to make [, use or] sell, the patented article, in the market, at a reasonable profit."[64]

41.     To determine a reasonable royalty rate, courts often employ the "hypothetical negotiation" or the "willing licensor-licensee" approach.[65]  This approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began."[66]  "The hypothetical negotiation tries, as best as possible, to recreate the *ex ante* licensing negotiation scenario and to describe the resulting agreement.  In other words, if infringement had not occurred, willing parties would have executed a license agreement specifying a certain royalty payment scheme."[67]

---

reasonable royalty, but to argue that this requirement exists even in the absence of any evidence from which a court may derive a reasonable royalty goes beyond the possible meaning of the statute."), *aff'd on other grounds*, 461 U.S. 648 (1983).

[64]*Trans-World Mfg. Corp. v. Al Nyman & Sons*, 750 F.2d 1552, 1568 (Fed. Cir. 1984) (alterations in original) (quoting *The Goodyear Tire & Rubber Co. v. Overman Cushion Tire Co.*, 95 F.2d 978, 984 (6th Cir. 1938)).

[65]*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

[66]*Id.* at 1325.

[67]*Id.*

42.     A determination of the royalty rate derived from a hypothetical negotiation is often made by assessing the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*[68]  These include: (1) established royalty rate for the patent; (2) license rates paid for comparable patents; (3) type of license (exclusive/non-exclusive or restricted/non-restricted); (4) licensor's established licensing policies; (5) competitive relationship between licensor and licensee; (6) convoyed sales; (7) duration and terms of the license; (8) commercial success and established profitability; (9) advantages over old methods; (10) nature of patented invention and benefits to those that use it; (11) extent of use of the patent by the infringer; (12) customary industry rate for invention or analogous inventions; (13) portion of profit that should be credited to the invention as distinguished from nonpatented elements, manufacturing processes, business risks, or significant features added by the infringer; (14) opinion testimony of qualified experts; and (15) amount that licensor and licensee would have agreed upon.[69]  The Federal Circuit "sanction[s] the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry."[70]

---

[68]318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see Minks v. Polaris Indus., Inc.*, 546 F.3d 1364, 1372 (Fed. Cir. 2008).

[69]*Georgia-Pacific*, 318 F. Supp. at 1120.

[70]*Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011).

43.     Pursuant to the first factor, the Court considers "[t]he royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty."[71]

44.     Plaintiff argues that this factor has no bearing on the determination of a reasonable royalty rate because there "is no evidence of an established royalty."[72]  For their part, Defendants argue that the parties' 2009 licensing discussions provide solid evidence of an established royalty rate.

45.     The Court finds that the parties' 2009 licensing discussions do not provide evidence of a reasonable royalty rate.  First, the hypothetical negotiation used to determine a reasonable royalty rate must take place before litigation begins, because the "litigation itself can skew the results of the hypothetical negotiation."[73]  Here, the negotiations took place in 2009, four years after the 2005 filing of this case, and Mr. Zitko testified that his primary reason for negotiating was to avoid the costs of litigation.  In his words, "[o]ur target, we want to avoid to pay high invoices to our lawyers because I pay every year maybe 50,

---

[71]*Georgia-Pacific*, 318 F. Supp. at 1120.

[72]Docket No. 163, at 17.

[73]*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010) ("[T]his court has acknowledged that the hypothetical reasonable calculation occurs before litigation and that litigation itself can skew the results of the hypothetical negotiation."); *see Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1078–79 (Fed. Cir. 1983) ("[S]ince the offers were made after the infringement had begun and litigation was threatened or probable, their terms should not be considered evidence of an established royalty, since license fees negotiated in the face of a threat of high litigation costs may be strongly influenced by a desire to avoid full litigation.") (internal quotation marks and citation omitted).

60,000 to my lawyer.  [Mr. Brooks] told me he will defend his patent. . . .  I said okay, I prepare royalty fee for you to stop—to stop—to stop this invoicing from the lawyer."[74] Influenced, as he clearly was, by the desire to avoid litigation, the Court cannot rely on the rates considered by the parties in their 2009 licensing negotiations.

46.    Second, it appears that the parties were negotiating not just a licensing agreement that would allow Defendants to sell the infringing pool covers, but also an agreement that would allow Aqua Shield to resell Defendants' products.[75]  It is impossible to tell how and to what extent the royalty rate may have changed if the parties had negotiated only a license allowing Defendants to sell the infringing pool covers.

47.    Finally, the parties' licensing discussions did not produce a mutually acceptable royalty rate.  Thus, the rate provided by Defendants cannot be relied on as an "established" royalty rate, and is therefore not probative in determining a reasonable royalty rate.

48.    The Court will not consider the second, third, sixth, tenth, thirteenth, and fourteenth *Georgia-Pacific* factors as the parties have not argued them and there is no evidence to support such an analysis.

49.    Pursuant to the fourth factor, the Court considers the "licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the

---

[74]Trial Tr. 140:16–22.

[75]*See id.* at 153:2–20, 240:8–12.

21

invention . . . ."[76]  As it was Aqua Shield's policy not to license the '160 Patent, this factor cuts in favor of a higher royalty rate.

50.    The fifth factor considers the "commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter."[77]  Here, the parties compete in selling the same type of pool covers throughout the United States.  Thus, this factor supports a higher royalty rate.

51.    Under the seventh factor, the Court considers the duration of the '160 Patent.  The duration of a patent is measured from the date of the hypothetical negotiation to the date the patent expires.[78]  A longer duration generally supports a higher royalty rate.[79]  Here, the hypothetical negotiation would have taken place in July 2005, just before infringement began.[80]  As the '160 Patent expires in July 2021, the patent would have endured for sixteen years after the date of the hypothetical negotiation.  This factor therefore cuts in favor of a higher royalty rate.

52.    The Court next considers the eighth *Georgia-Pacific* factor, the "established profitability of the product made under the patent; its commercial success; and its current

---

[76]*Georgia-Pacific*, 318 F. Supp. at 1120.

[77]*Id.*

[78]Skenyon et al., *supra* note 52, § 3:29.

[79]*Id.*

[80]*Lucent Techs., Inc.*, 580 F.3d at 1325.

popularity."[81]  Plaintiff argues that Aqua Shield has demonstrated sufficient success selling its pool covers to show that this factor weighs in favor of a high royalty rate. However, Plaintiff introduced no evidence regarding Aqua Shield's financial status aside from Mr. Brooks' unsubstantiated and vague testimony.  Defendants, however, have had at least some degree of success selling the patented product, as demonstrated by their sales of infringing pool covers.  Thus, the Court finds that this factor favors a higher royalty rate.

53.    Pursuant to the ninth factor, the Court considers the "utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results."[82]  The patented pool covers are easier to construct, are more aerodynamic, have a higher snow-load capacity, and are more leak-proof than other "boxy" pool covers.[83]  This factor therefore favors a higher royalty rate.

54.    The eleventh factor requires assessment of the "extent to which the infringer has made use of the invention . . . and any evidence probative of the value of that use."[84] Defendants have made thorough use of the patented invention, as demonstrated by Pool & Spa's sales of the infringing products.  This factor therefore supports a higher royalty.

---

[81]*Georgia-Pacific*, 318 F. Supp. at 1120.

[82]*Id.*

[83]Trial Tr. 101:11-25, 118:14–20, 118:21-25; 212:5–7.

[84]*Georgia-Pacific*, 318 F. Supp. at 1120.

23

55.    Pursuant to the twelfth factor, the Court considers the "portion of the profit or of the

selling price that may be customary in the particular business or in comparable businesses

to allow for the use of the invention or analogous inventions."[85]  This factor deals with

the narrow issue "of whether there is a *customary* portion of the profit of selling price

normally attributed to the patented invention or analogous ones.  As such, this factor is

not usually considered because evidence of a customary percentage of the profit or selling

price for the specific invention or analogous inventions is not very common."[86]  There

was no such evidence in this case.

56.    Plaintiff argues that this factor favors a higher royalty rate because "Aqua Shield has

established that a selling price attaining profits in the range of 10%–45% permit a pool

enclosure company to be viable in the United States using the patented invention."[87]

Aqua Shield's only evidence regarding its profit margins came by way of Mr. Brooks'

testimony, which the Court found to be not credible.  As such, Aqua Shield's argument

on this factor is without evidentiary support.  The Court therefore finds that this factor

does not affect the determination of a reasonable royalty rate.

---

[85]*Id.*

[86]Skenyon et al., *supra* note 52, § 3:34.

[87]Docket No. 163, at 20.

57.    The last *Georgia-Pacific* factor asks what royalty rate a willing licensor and licensee

would have agreed to had they negotiated a licensing agreement just prior to

infringement.

58.    Mr. Stonkus, the CEO of Pool & Spa and Defendants' representative in this case, testified

that a six-percent royalty rate would be customary in the pool-cover industry.[88]  However,

when he was asked how he came to the six-percent figure, Mr. Stonkus testified that, "[i]t

goes in line with when I have other dealers that offer our enclosures for sale, typically

they are in that five-percent range is what Pool & Spa is giving those as a royalty or

commission for selling our enclosures."[89]  Thus, the rate proposed by Mr. Stonkus would

not have been a royalty for licensing the '160 Patent, but rather would have been a

commission for selling another's unpatented products.  It is not clear that there is any

relationship between the commission rate Pool & Spa pays to third parties for selling

unpatented Pool & Spa enclosures and what a reasonable royalty would be for licensing

the '160 Patent.  The Court therefore finds Mr. Stonkus' opinion regarding a six-percent

royalty to be unhelpful.

59.    Plaintiff argues that a royalty rate of "no less than about 25%" is warranted in this case

because "Aqua Shield has established that a selling price attaining profits in the range of

---

[88]Trial Tr. 238:8–18.

[89]*Id.* at 240:19–22.

25

10%-45% permit a pool enclosure company to be viable in the United States using the patented invention."[90]

60.    There are two problems with this assertion.  First, aside from Mr. Brooks' unsubstantiated assertions, Plaintiff has introduced no evidence that a reasonable royalty rate should be at or near Aqua Shield's level of profitability.  Indeed, the hypothetical negotiation posits a royalty amount that *Defendants* "would be willing to pay as a royalty and yet be able to make [, use or] sell, the patented article, in the market, at a reasonable profit."[91]  Were Defendants to pay a royalty rate equal to the profit margin in the industry, they would make no profit.  The Court therefore cannot accept Plaintiff's assertion that a reasonable royalty should be equal to its profit margin.

61.    Second, even if the Court were persuaded that a reasonable royalty in this case would be equal to Plaintiff's profit margin, the Court would be unable to determine that rate because the Court has no reliable evidence of Aqua Shield's profit margin.  As stated, Plaintiff's only evidence regarding its profit margin was Mr. Brooks' unsubstantiated testimony, which the Court has found to be not credible.

62.    Having considered each of the *Georgia-Pacific* factors, the Court finds that it is unable to determine a reasonable royalty rate.  Although some of the factors weigh in favor of a "higher" royalty rate, the Court is without sufficient evidence to determine what that rate

---

[90]Docket No. 163, at 20–21.

[91]*Trans-World Mfg.*, 750 F.2d at 1568 (alterations in original) (quoting *The Goodyear Tire & Rubber Co.*, 95 F.2d at 984).

should be higher than.  For the reasons already stated, the Court cannot rely on Plaintiff's

assertion that Aqua Shield's profit margin is a reasonable royalty rate or on Defendants'

argument that the parties' 2009 licensing negotiations provide the rate.  The Court also

cannot accept Mr. Stonkus' testimony that a six-percent royalty rate is customary in the

industry.

63.    Although 35 U.S.C. § 284 states that, upon a finding of infringement, the Court "shall

award . . . in no event less than a reasonable royalty," the record in this case does not

contain sufficient evidence to determine a reasonable royalty rate.   The requirement that

the court award a reasonable royalty ceases to exist where there is an "absence of any

evidence from which a court may derive a reasonable royalty."[92]  Such is the case here.

To determine a reasonable royalty rate based on the evidence before the Court would be

nothing more than "pull[ing] the royalty out of a hat . . . ."[93]  The Court is unable and

unwilling to entertain such guesswork.  Accordingly, Plaintiff's request for damages

based on a reasonable royalty is denied.

64.    As Plaintiff has not met its burden to establish either the amount of its lost profits or a

reasonable royalty rate, the Court is unable to award Plaintiff any damages.  Indeed, in the

---

[92]*Devex Corp.*, 667 F.2d at 363.

[93]*Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 910 (N.D. Ill. 2012) (citing *Dow Chem. Co.*, 341 F.3d at 1382).

absence of evidence necessary to determine a reasonable royalty rate, not even nominal damages can be awarded.[94]

C.    ATTORNEY FEES

65.    Pursuant to 35 U.S.C. § 285, "[t]he court in exceptional cases may award reasonable attorney fees to the prevailing party."  Before exercising its discretion to determine whether attorney fees should be awarded, a court must first determine whether a case is exceptional.[95]  The party seeking attorney fees must prove that the case is exceptional by clear and convincing evidence.[96]  "The criteria for declaring a case exceptional include willful infringement, bad faith, litigation misconduct, and unprofessional behavior."[97]

"[T]he trial court has broad discretion in the criteria by which it determines whether to award attorney fees."[98]

---

[94]*See Devex Corp.*, 667 F.2d at 363 (affirming award of zero damages for lack of evidence); *Lindemann Maschinenfabrik v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990) ("[T]he statute obviates the need to show the fact of damage when infringement is admitted or proven, but that does not mean that a patentee who puts on little or no satisfactory evidence of a reasonable royalty can successfully appeal on the ground that the amount awarded by the court is not 'reasonable and therefore contravenes section 284.").

[95]*Enzo Biochem, Inc. v. Calgene, Inc.*, 188 F.3d 1362, 1370 (Fed. Cir. 1999).

[96]*Digeo, Inc. v. Audible, Inc.*, 505 F.3d 1362, 1368 (Fed. Cir. 2007).

[97]*Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1378 (Fed. Cir. 2005).

[98]*Id.* (quoting *Brooktree Corp. v. Advanced Micro Devices*, 977 F.2d 1555, 1582 (Fed. Cir. 1992)).

66. The Court finds that this is not an exceptional case. First, Defendants did not willfully infringe the '160 Patent. "[T]o establish willful infringement, a patentee must show by clear and convincing evidence that the infringer acted despite an objectively high likelihood that its actions constituted infringement of a valid patent."[99] In other words, Defendants' infringing actions must be objectively reckless to establish willful infringement.[100] Where an infringer's position is susceptible to a reasonable conclusion of no infringement, however, the infringer was not objectively reckless.[101]

67. The Court has found that although Defendants continued to sell and market infringing pool enclosures after this case was filed, they did so because they had a reasonable belief that their enclosures did not infringe the '160 Patent. This belief was based on the denial of Aqua Shield's motion for a preliminary injunction. Furthermore, after the Court ruled that Defendants' enclosures did infringe, Defendants made a good faith effort to design around the Patent by fixing the end panels of their pool covers in place. Thus, Plaintiff has not shown that Defendants willfully infringed as it has not met its burden to show that Defendants acted despite an objectively high likelihood of infringement.

---

[99]*In re Seagate Tech. LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007).

[100]*See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1310–11 (Fed. Cir. 2011).

[101]*Id.* 1310.

68.    Second, the Court finds that Defendants have not acted in bad faith, engaged in litigation

misconduct, or exhibited bad behavior such that an award of attorney fees would be

justified.[102]

69.    The Court therefore finds that this is not an exceptional case, and will not award attorney

fees.


D.    INDUCED INFRINGEMENT

70.    35 U.S.C. § 271(b) provides that "[w]hoever actively induces infringement of a patent

shall be liable as an infringer."  As the Court has already determined that Defendants are

liable for infringement, the Court finds it unnecessary to determine whether they also

induced infringement.

E.    WILLFUL INFRINGEMENT

71.    Plaintiff argues that Defendants willfully infringed the '160 Patent such that Aqua Shield

is entitled to increased damages.  When a court determines that a party has willfully

infringed, it may increase the damages up to three times the amount found or assessed.[103]

As the Court has already determined that Defendants did not willfully infringe the '160

---

[102]*J.P. Stevens Co., Inc. v. Lex Tex Ltd., Inc.*, 822 F.2d 1047, 1052 (Fed. Cir. 1987)
(stating that the purpose of § 285 is to provide courts discretion to award attorney fees "where it
would be *grossly unjust* that the winner be left to bear the burden of his own counsel which
prevailing litigants normally bear").

[103]35 U.S.C. § 284 ("[T]he court may increase the damages up to three times the amount
found or assessed.").

Patent and that Plaintiff has failed to meet its burden to prove damages, the Court need not discuss this claim further.

F.    PERMANENT INJUNCTION

72.    In cases of patent infringement, courts "may grant injunctions in accordance with the principles of equity to prevent the violation of any right secured by patent, on such terms as the court deems reasonable."[104]  Plaintiff must satisfy a four-factor test in order to be granted a permanent injunction.  Specifically, Aqua Shield must show: "(1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."[105]  "Absent adverse equitable considerations, the winner of a judgment of validity and infringement may normally expect to regain the exclusivity that was lost with the infringement."[106]  Ultimately, however, "[t]he decision to grant or deny permanent injunctive relief is an act of equitable discretion by the district court."[107]

73.    Aqua Shield contends that it has and will continue to suffer irreparable harm due to Defendants' infringement.  Specifically, Plaintiff argues that Defendants' competition has

---

[104]*Id.* § 283.

[105]*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

[106]*Edwards Lifesciences AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012).

[107]*eBay Inc.*, 547 U.S. at 391.

harmed Aqua Shield by reducing its selling price and by impinging on its exclusive right to sell products covered by the '160 Patent.  Defendants respond that Aqua Shield has not been irreparably harmed because Defendants' pool covers are in a more expensive market than Aqua Shield's "cheaper, less customize-able" covers.[108]  Defendants therefore contend that their products do not compete with those of Aqua Shield and, as a result, Plaintiff has suffered no harm.

74.    "'[T]he irreparable harm inquiry seeks to measure harms that no damages payment, however great, could address."[109]  "Direct competition between the patentee and the infringer is evidence the patentee is irreparably harmed by the infringing activities."[110] "Where two companies are in competition against one another, the patentee suffers the harm—often irreparable—of being forced to compete against products that incorporate and infringe its own patented inventions."[111]

75.    Defendants and Plaintiff are direct competitors.  Therefore, the Court also finds that Aqua Shield has suffered the irreparable harm of being forced to compete against products that infringe the '160 Patent.

---

[108]Docket No. 164, at 23.

[109]*Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012).

[110]*Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 2013 WL 3043668, at *2 (D. Nev. June 17, 2013) (citing *Robert Bosch LLC v. Pylon Mfg. Corp.*, 659 F.3d 1142, 1152–54 (Fed. Cir. 2011)).

[111]*Douglas Dynamics, LLC v. Buyers Prods. Co.*, 717 F.3d 1336, 1345 (Fed. Cir. 2013).

76.     Plaintiff has also shown that it has suffered a loss of reputation.  Mr. Brooks testified that

it was Aqua Shield's policy to not license the '160 Patent to any other company.

According to Mr. Brooks, this was because Aqua Shield "intend[ed] to manufacture and

distribute our product ourselves.  [Aqua Shield] buil[t] the market just to do it ourselves

exclusively."[112]

77.     "Exclusivity is closely related to the fundamental nature of patents as property rights.  It

is an intangible asset that is part of a company's reputation . . . ."[113]  Where, as here, Aqua

Shield's "exclusive right to make, use, and sell the patented inventions is under attack by

[Defendants'] infringement," the Court concludes that Plaintiff's reputation has been

irreparably harmed.[114]

78.     To satisfy the second factor for a permanent injunction Plaintiff must show that remedies

at law, such as monetary damages, would be inadequate to compensate Aqua Shield for

Defendants' infringement.[115]  The Court finds that Plaintiff has satisfied this element.

Although monetary damages would likely be sufficient to compensate Plaintiff for lost

sales, they cannot adequately compensate Plaintiff for its loss of reputation.[116]

---

[112]Trial Tr. 108:13–15.

[113]*Douglas Dynamics*, 717 F.3d at 1345.

[114]*Id.*

[115]*Richardson v. Suzuki Motor Co.*, 868 F.2d 1226, 1247 (Fed. Cir. 1989).

[116]*See Douglas Dynamics*, 717 F.3d at 1345.

33

79. Considering the balance of hardships between the parties, the Court finds that a remedy is warranted. Defendants have not presented evidence regarding the hardship that they would suffer should the court grant a permanent injunction. On the other hand, "requiring [Aqua Shield] to compete against its own patented invention, with the resultant harms described above, places a substantial hardship on [Aqua Shield]."[117]

80. The final factor also favors entry of a permanent injunction. Although competition generally serves the public interest, the Court finds that allowing Defendants to continue to copy the '160 Patent has "the effect of inhibiting innovation and incentive."[118] "This detrimental effect, coupled with the public's general interest in the judicial protection of property rights in inventive technology," outweighs any interest the public may have in purchasing Defendants' infringing products.[119]

81. Having determined that Plaintiff is entitled to a permanent injunction, it is incumbent on the Court to determine the parameters of that injunction. Rule 65(d) of the Federal Rules of Civil Procedure specifies the proper form and scope of an injunction issued by a district court:

> (1) Contents. Every order granting an injunction and every restraining order must:
>      (A) state the reasons why it issued;
>      (B) state its terms specifically; and

---

[117] *Robert Bosch LLC*, 659 F.3d at 1156.

[118] *Id.*

[119] *Id.*

(C) describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required.
(2) Persons Bound.  The order binds only the following who receive actual notice of it by personal service or otherwise:
(A) the parties;
(B) the parties' officers, agents, servants, employees, and attorneys; and
(C) other persons who are in active concert or participation with any described in Rule 65(d)(2)(A) or (B).

82.    "In accord with the policy of Rule 65(d), the Supreme Court has denounced broad injunctions that merely instruct the enjoined party not to violate a statute."[120]  In the patent infringement context, the Federal Circuit "has rejected as overly broad a permanent injunction that simply prohibits future infringement of a patent."[121]  "[T]he only acts [an] injunction may prohibit are infringement of the patent by the adjudicated devices and infringement by devices no more than colorably different from the adjudicated devices. In order to comply with Rule 65(d), the injunction should explicitly proscribe only those specific acts."[122]  Furthermore, "a trial court, upon a finding of infringement, must narrowly tailor an injunction to fit the specific adjudged violations."[123]

83.    Plaintiff argues that Defendants should be enjoined from

(1) the further and continued manufacture and sale of infringing devices including the current product configuration of the models Elegant, Universe, Laguna, Tropea, Combi, Style, Veranda, Spa and Orient pool enclosures with generally flat

---

[120]*Int'l Rectifier Corp. v. IXYS Corp.*, 383 F.3d 1312, 1316 (Fed. Cir. 2004) (citing *NLRB v. Express Publ'g Co.*, 312 U.S. 426, 435–36 (1941)).

[121]*Id.*

[122]*Id.*

[123]*Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1311 (Fed. Cir. 2002).

and removable end-panels ("Infringing Devices"); (2) the importation, distribution through sale and use of dismantled Infringing Devices; and (3) the manufacture, importation, offer for sale, sale and/or use of any pool enclosure devices within the scope of claims 1-14 and 16 of the '160 Patent.[124]

Defendants have not offered a proposed injunction.

84.    The Court finds that portions of Plaintiff's proposed injunction are overly broad. To begin with, the Court has not found Defendants' model Elegant to infringe the '160 Patent and therefore cannot enjoin Defendants from manufacturing or selling it. Second, Plaintiff's requested injunctive relief is not limited to Defendants' activities in the United States. As Plaintiff has not shown that Defendants' products reach the United States through any channel other than through Pool & Spa's importation, the Court will not enjoin the international manufacture or sale of the infringing models.[125] Finally, the Court is unable to grant Plaintiff's third request, which effectively seeks an injunction of any future infringement of the '160 Patent by Defendants, as the Court has power to prohibit only "infringement of the patent *by the adjudicated devices* and infringement by devices not more than colorably different from the adjudicated devices."[126] As set forth more fully below, however, the Court will enjoin Defendants' from making, using, selling, or offering to sell in the United States or importing into the United States the models this

---

[124]Docket No. 163, at 25.

[125]The Patent Act prohibits only one who "makes, uses, offers to sell, or sells any patented invention, within the *United States or imports into the United States* any patented invention during the term of the patent therefore, infringes the patent." 35 U.S.C. § 271 (emphasis added).

[126]*Int'l Rectifier Corp.*, 383 F.3d at 1316 (emphasis added).

36

Court has previously determined to infringe the '160 Patent, as well as any device that is

not more than colorably different from the adjudicated devices.

85.    In sum, the Court finds that: (1) Plaintiff has failed to meet its burden to establish

entitlement to damages in the form of either lost profits or a reasonable royalty; (2) this

case is not exceptional such that Plaintiff is entitled to attorney fees; and (3) Plaintiff is

entitled to a permanent injunction as set forth below.

## IV.  CONCLUSION

It is therefore

ORDERED that judgment is entered in favor of Plaintiff and against Defendants on

Plaintiff's claim that Defendants' models Universe, Laguna, Tropea, Combi, Style, Veranda, Spa,

and Orient infringe claims 1–14 and 16 of the '160 Patent.  It is further

ORDERED that Plaintiff's claim for damages is DENIED.  It is further

ORDERED that Plaintiff's request for a permanent injunction is GRANTED to the extent

it seeks the injunction described below and is DENIED in all other respects.  It is further

ORDERED that Defendants Inter Pool Cover Team, Alukov HZ Spol. S.R.O., Alukov,

Spol. S.R.O., Pool & Spa Enclosures, their officers, agents, servants, employees, and attorneys,

and those persons in active concert or participation with such person(s) who receive actual notice

of this Order by personal service or otherwise shall be permanently enjoined from infringing,

either directly, by inducement, or by contribution, the '160 Patent, by, during the term of the

Patent, making, using, selling, or offering to sell the products adjudged to infringe in the United

States or importing into the United States the products adjudged to infringe or not more than

37

colorably different from the adjudicated devices.  The products adjudged to infringe the '160

Patent include the following pool cover models manufactured or offered for sale by Defendants:

Universe, Laguna, Tropea, Combi, Style, Veranda, Spa, and Orient, with generally flat and

removable end-panels.

　　　　The Clerk of Court is directed to enter judgment in accordance with this Order and close

this case forthwith.

　　　　DATED  August 14, 2013.

　　　　　　　　　　　BY THE COURT:

　　　　　　　　　　　_____
　　　　　　　　　　　TED STEWART
　　　　　　　　　　　United States District Judge



US006637160B2

(12) **United States Patent**

Brooks

(10) Patent No.: **US 6,637,160 B2**

(45) Date of Patent: **Oct. 28, 2003**

(54) **TELESCOPIC ENCLOSURE**

(76) Inventor: **Bob Brooks**, 46 Saint Marks Pl.,
Massapequa, NY (US) 11758

( * ) Notice: Subject to any disclaimer, the term of this
patent is extended or adjusted under 35
U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/902,417**

(22) Filed: **Jul. 10, 2001**

(65) **Prior Publication Data**

US 2003/0014927 A1 Jan. 23, 2003

(51) **Int. Cl.⁷** ............................ **E04B 1/346**; E04B 7/16
(52) **U.S. Cl.** .............................. **52/66**; 52/67; 135/119;
135/129; 49/163; 4/502; 4/503; 160/272;
160/273.1; 296/100.03; 296/100.17; 296/105
(58) **Field of Search** ................................ 52/65, 66, 63,
52/67; 135/96, 115, 116, 119, 124, 129;
49/163, 505; 4/502, 503, 498; 160/272,
273.1; 296/100.03, 105, 100.17

(56) **References Cited**

U.S. PATENT DOCUMENTS

3,766,691 A * 10/1973 Ray ........................... 52/63
4,280,306 A * 7/1981 Milinic ........................ 52/63
4,783,861 A * 11/1988 Leurent ....................... 4/498

5,507,121 A * 4/1996 Taylor ........................... 52/66

* cited by examiner

*Primary Examiner*—Carl D. Friedman
*Assistant Examiner*—Yvonne M. Horton
(74) *Attorney, Agent, or Firm*—Michael I. Kroll

(57) **ABSTRACT**

The present invention **10** discloses a plurality of movable
transparent arcuate sections **12** that can roll on their own
designated tracks **14** to enclose or expose a sun room or pool
area **18**. Thus, the present invention **10** is comprised of a
plurality of overlapping transparent arcuate arches or sec-
tions **12** positioned on parallel tracks **14**. The arches **12** can
be selectively moved to any position on the parallel tracks
**14**. The two distal end arches have removable end closure
panels **20**. Each of the transparent panel members **22** or arch
**12** are positioned within a frame member **16** having a
plurality of wheels **36** engaging the spaced apart track
members **14**. Track members **14** are fixedly positioned to the
ground or foundation structures **58** in a spaced-apart parallel
configuration. Each side of an arch **12** consists of a plurality
of wheels **36** fixedly positioned between spaced apart track
elements **14** having hook-like terminations **53** to prevent
dislocation of the frame member **16** from the track member
**14**. Each arch **12** is slidably positioned on its respective track
**14** before plugs **54** are inserted into each track rail distal end.

**16 Claims, 21 Drawing Sheets**







**FIG. 2**





FIG. 4



FIG. 5



FIG. 6



# FIG. 7



# FIG. 8



**FIG. 9**





# FIG. 11



**FIG. 12**



# FIG. 13



# FIG. 14



**FIG. 15**



# FIG. 16



14

52

62

# FIG. 17



# FIG. 18



# FIG. 19





# FIG. 20



FIG. 21

US 6,637,160 B2

<table>
<tr><td>1</td><td>2</td></tr>
</table>

# TELESCOPIC ENCLOSURE

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates generally to outdoor enclosures and more specifically to a telescopic enclosure providing a plurality of transparent rolling sections that can roll on their own designated tracks to enclose or expose a sun room or pool area to the elements.

The present invention is comprised of a plurality of overlapping transparent arches positioned on parallel tracks. The arches can be selectively moved to any position on the parallel tracks. The two distal end arches have removable closure panels. Each of the arches transparent members are positioned within a frame member having a plurality of wheels engaging spaced apart track members.

Track members are fixedly positioned to the ground or foundation structures in a spaced apart parallel configuration. Each side of an arch consists of a plurality of wheels fixedly positioned between spaced apart track wall elements having hook like terminations to prevent dislocation of the frame member from the track member. Each arch is rollably positioned on its respective track before plugs are inserted into each track rail distal end.

### 2. Description of the Prior Art

There are other exterior enclosure apparatus designed to enclose pool and deck areas. Typical of these is U.S. Pat. No. 3,979,782 issued to Lamb on Sep. 14, 1976.

Another patent was issued to Kumode on Nov. 27, 1979 as U.S. Pat. No. 4,175,361. Yet another U.S. Pat. No. 4,381,629 was issued to Ahn on May 3, 1983 and still yet another was issued on Apr. 21, 1987 to Martin et al. as U.S. Pat. No. 4,659,136.

Another patent was issued to Ozdemir on Aug. 4, 1987 as U.S. Pat. No. 4,683,686. Yet another patent was issued to Wardell et al on Aug. 20, 1996 as U.S. Pat. No. 5,546,972 and still yet another patent was issued to Lonnberg on Nov. 3, 1998 as U.S. Pat. No. 5,829,204.

Another patent was issued to Last on Dec. 8, 1998 as U.S. Pat. No. 5,845,343. Another patent was issued to Last on Sept. 14, 1999 as U.S. Pat. No. 5,950,253.

### U.S. Pat. No. 3,979,782

#### Inventor: Joe Lamb

#### Issued: Sep. 14, 1976

A protective swimming pool covering apparatus is disclosed wherein the apparatus includes a flexible impervious cover sheet capable of being extended and retracted over a swimming pool. Each lateral side of the cover sheet is adapted with a longitudinally beaded side edge which is slidably held in a longitudinal open channel or track cut into a slide way member fixed to the longitudinal margins of the swimming pool. The longitudinal opening of the slide way means is sized such that it is slightly smaller than the diameter of the beaded side edge such that under normal operating conditions the bead will be slidably held within the track or channel. However, under conditions of excessive lateral stress, the bead will be sufficiently compressed and be pulled through the opening and away from the channel. In addition, the end sections of the slide way means is adapted with a stationary channeled guide piece having a pair of flared end sections and a longitudinal side opening. The

stationary guide piece is mounted such that the channels of the guide piece and the slide way means are in aligned registry with each other. The longitudinal side opening of the stationary guide piece is substantially smaller than the longitudinal side opening of the slide way means making disengagement of the bead from the channel opening substantially more difficult than that from the slide way means.

### U.S. Pat. No. 4,175,361

#### Inventor: Masami Kumode

#### Issued: Nov. 27, 1979

An openable canopy housing having a series of movable, telescoping transparent arched panels which form the combination roof and sides. Part of the roof of the housing is formed by a horizontal beam which runs the length of the structure. The transparent panels can be selectively opened or closed to provide a structure which can be used for indoor as well as outdoor use.

### U.S. Pat. No. 4,381,629

#### Inventor: Min H. Ahn

#### Issued: May 3, 1983

A greenhouse comprising walls defining an area. A roof covers a portion of the area. Track means are interposed between the roof and the walls so that the roof may be moved along the track to cover a selected part of the area.

### U.S. Pat. No. 4,659,136

#### Inventor: John Martin et al.

#### Issued: Apr. 21, 1987

An improved apparatus for covering at least a part of the open bed of a land or marine vehicle or the like includes an enclosure structure telescopically collapsible and extendable with an access opening and door assembly rearward longitudinally movable portion thereof. An improved end gate assembly is selectively positionable and releasably securable at a number of continuously variable longitudinal locations on the open bed, corresponding with the movable rearward section of the enclosure. The apparatus also includes an improved track assembly for the telescopically collapsible and extendable enclosure sections, with apparatus for substantially preventing or minimizing the accumulation of corrosion, water or other foreign materials that would hinder the smooth and free operation of the enclosure structure.

### U.S. Pat. No. 4,683,686

#### Inventor: Veli Ozdemir

#### Issued: Aug. 4, 1987

A removable enclosure cover for a swimming pool or the like is disclosed. The enclosure cover includes a plurality of rigid frame members of rectangular panel sections. The frame members are spaced apart and extend parallel to one another transversely across the pool area. A flexible material is stretched between the frame members. A pair of spaced parallel channel-shaped track members extend along the sides of the pool and guide means is attached to the lower ends of each of the frame members. The guide means has

US 6,637,160 B2

3

rollers which extend into the interior of the track members. One roller rolls along the bottom of the track members and is mounted on a vertically movable carriage, permitting the frame members to be moved together to one end of the pool deck and collapsing the flexible material to uncover the pool. A threaded adjustment is provided for raising and lowering the carriage with the roller thereon so that the top portion of the track may be clamped between the roller carriage and the bottom of the frame member. The other roller is adapted to engage the sides of the track member to longitudinally guide the frame members.

U.S. Pat. No. 5,546,972

Inventor: Jacqueline R. Wardell et al.

Issued: Aug. 20, 1996

A collapsible cover system and kit therefore are removably mounted to a plurality of spaced stake sockets secured within longitudinally extending areas on opposite sides of a swimming pool or hot tub. Stakes, disposed in the stake sockets, are slidingly connected to two lengths of spaced guide tracks that extend along the sides of the pool or hot tub. Inverted bow-shaped members having free ends are removably secured to carrier means that slidingly connect the bow-shaped members to the guide. In additional embodiments the spaced guide tracks are deposed either in a trough that may be covered when the particular rail sections are not in use, or hingedly deposed adjacent a trough into which each particular rail sections may be stored when they are not in use.

U.S. Pat. No. 5,829,204

Inventor: Benth Lonnberg

Issued: Nov. 3, 1998

An arrangement for openable roofs, especially for glazed verandas and balconies. The arrangement is a horizontal supporting section (10) which defines an elongated guiding channel (11) having an elongated side opening (12), and a horizontal roofing panel (20) which is movable in the longitudinal direction of the supporting section (10). The roof panel (20) has a lateral edge (21) that extends into the guide channel (11) of the supporting section (10). A plurality of separate guiding and spacing members (40) are mounted spaced from each other in a direction of the guiding channel (11), on the lateral edge (21), received in the guiding channel (11), and abuts against the inner wall of the guiding channel (11) to thereby ensure that there is a play both upwards and downwards in the side opening (12) between the panel (20) and the supporting section (10). The guiding and spacing members (40) are designed so as to allow a turning movement of the panel (20). Compressible sealing means (50) are arranged in the guiding channel (11) between the side opening (12) and the guiding and spacing members (40).

U.S. Pat. No. 5,845,343

Inventor: Harry Last

Issued: Dec. 8, 1998

A track assembly for allowing movement of a flexible enclosure cover over an area to be enclosed as, for example, a body of water in a swimming pool. The assembly comprises a pair of spaced apart tracks mounted on opposite sides of the area to be enclosed with each being comprised

4

of an elongate strip. Each track strip comprises a cable receiving channel with a gutter or debris trough located generally beneath the channel for collection of debris. Preferably, a slider can be located in the cable receiving channel for locking to the cable and for securement of the cover to the cable. The track can be constructed to also allow for lubrication of the cable receiving channel enabling a slider mechanism to freely move therein. When a slider is used, it extends into each channel at approximately a 45-degree angle with respect to a vertical direction. In accordance with this construction, debris which might otherwise collect in the cable receiving channel will drop into the gutter and will not interfere with movement of the slider mechanism or the leading edge of the cover. The slider may be adjustably secured to a rigid body which is, in turn, secured to the leading edge of the cover, and which allows side-to-side adjustment of the leading edge. Adjustment in the 45 degree. angulated plane could reduce bending moment forces on the slider and track.

U.S. Pat. No. 5,950,253

Inventor: Harry Last

Issued: Sep. 14, 1999

A track assembly for allowing movement of a flexible enclosure cover over an area to be enclosed as, for example, a body of water in a swimming pool. The assembly comprises a pair of spaced apart tracks mounted on opposite sides of the area to be enclosed with each being comprised of an elongate strip. Each track strip comprises a cable receiving channel with a gutter or debris trough located generally beneath the channel for collection of debris. Preferably, a slider can be located in the cable receiving channel for locking to the cable and for securement of the cover to the cable. The track can be constructed to also allow for lubrication of the cable receiving channel enabling a slider mechanism to freely move therein. When a slider is used, it extends into each channel at approximately a 45 degree. angle with respect to a vertical direction. In accordance with this construction, debris which might otherwise collect in the cable receiving channel will drop into the gutter and will not interfere with movement of the slider mechanism or the leading edge of the cover. The slider may be adjustably secured to a rigid body which is, in turn, secured to the leading edge of the cover, and which allows side-to-side adjustment of the leading edge. Adjustment in the 45 degree. angulated plane could reduce bending moment forces on the slider and track.

SUMMARY OF THE PRESENT INVENTION

The present invention discloses a plurality of movable transparent arcuate sections or arches that can roll on their own designated parallel tracks to enclose or expose a sun room or pool area. The arches can be selectively moved to any position on the parallel tracks. The two distal end arches have removable end closure panels. Each of the transparent members of the arches are positioned within a frame member having a plurality of wheels engaging the spaced apart track members. Track members are fixedly positioned to the ground or foundation structures in a spaced-apart parallel configuration. Each side of an arch consists of a plurality of wheels fixedly positioned between spaced apart track elements having hook-like terminations to prevent dislocation of the frame member from the track member. Each arch is slidably positioned on its respective track before plugs are inserted into each track rail distal end.

US 6,637,160 B2

5

A primary object of the present invention is to provide a telescopic enclosure providing a plurality of sliding sections which slide on their own designated, respective track and slide over one another in order to enclose or expose a sun room or swim pool to the elements.

Another object of the present invention is to provide a telescopic enclosure providing a plurality of overlapping glazed arches positioned on parallel tracks. The arches can be selectively moved to any position on the parallel tracks.

Yet another object of the present invention is to provide two distal end arches having removable closure panels.

Still yet another object of the present invention is to provide a telescopic enclosure providing a plurality of sliding sections which slide on their own designated, respective track and slide over one another in order to enclose or expose a sun room or swim pool to the elements, each arch consisting of a plurality of wheels engaging the track members, transparent arch member positioned with a frame member, and a plurality of hook like terminations to prevent dislocation of the frame member from the track member.

Yet another object of the present invention is to provide track plugs that are inserted into each track rail.

Yet another object of the present invention is to provide an enclosure for swim pools and deck and patio areas.

Additional objects of the present invention will appear as the description proceeds.

The present invention overcomes the shortcomings of the prior art by providing a telescopic enclosure providing a plurality of sliding sections which slide on their own designated, respective track and slide over one another in order to enclose or expose a sun room or swim pool to the elements, each arch consisting of a plurality of wheels engaging the track members, transparent arch member positioned with a frame member, and a plurality of hook like terminations to prevent dislocation of the frame member from the track member. Also, to provide track plugs that are inserted into each track rail. Also to provide two distal end arches having removable closure panels.

The foregoing and other objects and advantages will appear from the description to follow. In the description reference is made to the accompanying drawings, which form a part hereof, and in which is shown by way of illustration specific embodiments in which the invention may be practiced. These embodiments will be described in sufficient detail to enable those skilled in the art to practice the invention, and it is to be understood that other embodiments may be utilized and that structural changes may be made without departing from the scope of the invention. In the accompanying drawings, like reference characters designate the same or similar parts throughout the several views.

The following detailed description is, therefore, not to be taken in a limiting sense, and the scope of the present invention is best defined by the appended claim

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is an illustrative view of the present invention showing sliding sections fully deployed. (Four Sections Shown)

FIG. 2 is an illustrative view of the present invention showing sliding sections fully deployed. (Three Sections Shown)

FIG. 3 is an illustrative view of the present invention showing sliding sections fully deployed. (Two Sections Shown)

6

FIG. 4 is an illustrative view of the present invention showing sliding sections partially retracted or nested. (Four Sections Shown)

FIG. 5 is an illustrative view of the present invention showing sliding sections fully retracted or nested. (Four Sections Shown)

FIG. 6 is an illustrative view of the present invention showing sliding sections fully deployed. (Four Sections Shown)

FIG. 7 is an illustrative view of the present invention showing sliding sections fully deployed. (Three Sections Shown)

FIG. 8 is an illustrative view of the present invention showing sliding sections fully deployed. (Two Sections Shown)

FIG. 9 is an illustrative view of the present invention showing sliding sections partially nested. (Four Sections Shown)

FIG. 10 is an illustrative view of the present invention showing sliding sections fully nested. (Four Sections Shown)

FIG. 11 is an illustrative view of the present invention in an alternate glazing shape.

FIG. 12 is a detail view of the track and bottom portion of the frame of the present invention.

FIG. 13 a detail view of the bottom portion of the frame of the present invention.

FIG. 14 is a detail view of the lower portion of the enclosure of the present invention.

FIG. 15 is a front view of the present invention.

FIG. 16 is a sectional view of the lower portion of the present invention.

FIG. 17 is a detail perspective view of the lower portion of the present invention.

FIG. 18 is a sectional view of the lower portion of the present invention.

FIG. 19 is a cross sectional view of the present invention.

FIG. 20 is a front view of track and cover plate of the present invention.

FIG. 21 is a detail view of the track and bottom portion of the frame of the present invention in a wind condition.

LIST OF REFERENCE NUMERALS

With regard to reference numerals used, the following numbering is used throughout the drawings.

10 present invention
11 building
12 sliding sections
14 track
16 arcuate frame members
18 end frame members
20 end panels
22 transparent panel
24 pedestal
26 non-pedestal design
28 partially retracted section
30 partially retracted section
32 partially retracted section
34 non-retracted section
36 wheel
38 pool
40 anchor plate
42 U-shaped frame
44 horizontal frame member

US 6,637,160 B2

7

46 track rail
50 base of track plate
52 slot
53 hook-like end
54 plastic end plug
56 plastic stop rod
58 foundation
60 rubber flap
62 additional track element
64 track cover
66 spacer
68 wind
70 hooks
72 straps
74 U-shaped receptacle
76 notch
78 edge of rail

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

The following discussion describes in detail one embodiment of the invention and several variations of that embodiment. This discussion should not be construed, however, as limiting the invention to those particular embodiments since practitioners skilled in the art will recognize numerous other embodiments as well. For a definition of the complete scope of the invention, the reader is directed to the appended claims.

Turning to FIG. 1, shown therein is an illustrative view of the present invention 10 disposed onto a proximate building 11 such as a residence showing multiple movable arcuate sections 12 fully deployed. Sections 12 comprise generally rectangular, planar, transparent panels 22 having two generally horizontal ends and two generally vertical sides. Four sections are shown in FIG. 1. The aqua shield telescopic sun room enclosure of the present invention 10 provides a plurality of rollable sections 12 which roll on their own designated, respective, horizontal tracks 14 and move laterally over one another in a telescoping fashion in order to enclose or expose a sun room to the elements. Also shown are the multiple arcuate support frame members 16 having a first and second end and a first and second side (See FIG. 19 for details) including a pair of end frame members 18 along with generally flat end panels 20. An alternative design 26 not having a pedestal 24 is also shown.

Turning to FIG. 2, shown therein is an illustrative view of the present invention 10 showing sections 12 fully deployed. Three sections are shown in this view. The aqua shield telescopic sun room enclosure of the present invention 10 provides a plurality of sections 12 which move on their own designated, respective tracks 14 and move over one another in order to enclose or expose a sun room to the elements. Also shown are the frame members 16, end panels 20 and transparent panels 22.

Turning to FIG. 3, shown therein is an illustrative view of the present invention 10 showing sections 12 fully deployed. Two sections are shown in this view. The aqua shield telescopic sun room enclosure of the present invention 10 provides a plurality of sections 12 which move on their own designated, respective tracks 14 and move over one another in order to enclose or expose a sun room to the elements. Also shown are the frame members 16, end panels 20 and transparent panels 22.

Turning to FIG. 4, shown therein is an illustrative view of the present invention 10 showing sections 12 partially retracted or nested. Four sections are shown in this view. The

8

aqua shield telescopic sun room enclosure of the present invention 10 provides a plurality of sections 12 which move on their own designated, respective tracks 14 and move over one another in order to enclose or expose a sun room to the elements. Three sections 28, 30, 32 are shown partially retracted while a fourth section 34 is not retracted. Other elements previously disclosed are also shown.

Turning to FIG. 5, shown therein is an illustrative view of the present invention 10 showing sections 28, 30, 32, 34 fully retracted or nested. Four sections are shown in this view being disposed so that those with smaller diameters are placed inward of those with larger diameters so that they can telescope. The aqua shield telescopic sun room enclosure of the present invention 10 provides a plurality of sections 28, 30, 32, 34 which move on their own designated, respective tracks 14 and move over one another in order to enclose or expose a sun room to the elements. Other elements previously disclosed are also shown.

Turning to FIG. 6, shown therein is an illustrative view of the present invention 10 showing sections 12 fully deployed over a swimming pool 38. Four sections are shown in this view. The aqua shield of the present invention 10 is comprised of a plurality of overlapping arcuate arches or sections 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable end closure panels 20. Each of the arches has a plurality of wheels 36 engaging track members 14. Also shown are the frame members 16, transparent panels 22 and anchor plates 40.

Turning to FIG. 7, shown therein is an illustrative view of the present invention 10 showing sections 12 fully deployed. Three sections are shown in this view. The present invention 10 is comprised of a plurality of overlapping arches 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable closure panels 20. Each of the arches has a plurality of wheels 36 engaging track members 14. Other elements previously disclosed are also shown.

Turning to FIG. 8, shown therein is an illustrative view of the present invention 10 showing sections fully deployed. Two sections are shown. The present invention 10 is comprised of a plurality of overlapping arches 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable closure panels 20. Each of the arches has a plurality of wheels 36 engaging track members 14. Other elements previously disclosed are also shown.

Turning to FIG. 9, shown therein is an illustrative view of the present invention 10 showing sections 12 partially nested. Three sections are shown. The present invention 10 is comprised of a plurality of overlapping arches 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable closure panels 20. Each of the arches 12 has a plurality of wheels 36 engaging track members 14. Other elements previously disclosed are also shown.

Turning to FIG. 10, shown therein is an illustrative view of the present invention 10 showing sections 12 fully nested. Four Sections are shown. The present invention 10 is comprised of a plurality of overlapping arches 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable closure panels 20. Each of the arches 12 has a plurality of wheels 36 engaging track members 14. Other elements previously disclosed are also shown.

US 6,637,160 B2

9 10

Turning to FIG. 11, shown therein is an illustrative view of the present invention 10 in an alternate, half circle-like shape. Also shown elsewhere are the one-fourth of an ellipse shape of FIG. 1 and the half of an ellipse shape of FIG. 6. The present invention 10 is comprised of a plurality of overlapping arches 12 positioned on parallel tracks 14. The arches 12 can be selectively moved to any position on the track 14. The two distal end arches have removable closure panels 20. Each of the arches has a plurality of wheels 36 engaging track members 14. Other elements previously disclosed are also shown.

Turning to FIG. 12, shown therein is a detail view of the track 14 and bottom portion of the frame 16 of the present invention. Each of the two ends of each transparent panels 22 of section 22 are disposed within an upright standing U-shaped frame member 42 and each horizontal frame member 44 has a plurality of wheels 36 engaging spaced apart track rail members 46 using anchor plate 40. Three separate horizontal frame member units 44 are shown along with the track plate base 50 having a slot 52 for receiving additional tracks.

Turning to FIG. 13, shown therein is a detailed view of the bottom portion of the frame 16 of the present invention. Each side of an arch 12 consists of a plurality of wheels 36 fixedly disposed within a downwardly disposed U-shaped frame element 44 having a downwardly extending anchor plate 40 with hook-like lower end terminations 53 to prevent dislocation of the frame member 44 from the track rail 46(not shown). Also shown is the upwardly disposed U-shaped frame 42 which receives the lower end of section 12.

Turning to FIG. 14, shown therein is a detail view of the lower portion of the enclosure of the present invention. Track member rails 46 are fixedly positioned to the ground or foundation structures in a spaced apart parallel configuration. Each arch 12 is slidably positioned on its respective frame member 44 and track rail 46 before a plastic end plug 54 and a plastic stop rod 56 are inserted into the ends of each track rail 46. Other elements previously disclosed are also shown.

Turning to FIG. 15, shown therein is a front view of the present invention 10. The two tracks 14 are mounted to a flat foundation 58, on parallel and opposite sides of a swimming pool 38. Plastic plugs 54 (not shown) are placed in the end of the track after the sections are in place. Each section 12 is placed into the track, beginning with the one with the smallest diameter on the interior. An unlimited amount of enclosure sections 12 can be assembled. Each section 12 moves independently from the others by opening and closing telescopically. Also shown are inwardly extending rubber flaps 60 along with other elements previously disclosed.

Turning to FIG. 16, shown therein is a sectional view of the lower portion of the present invention. Shown are the moving parts that comprise the device of the present invention. The rails 46 of the track 14 are designed so that the mating wheels 36 can ride upon them at angles agreeable or complementary to the angle of the bottom portion of the enclosure. Hooks 53 overlap the enlarged, exposed edge 78 of the rail 46 to secure the anchor plate 40 thereto. Other elements previously disclosed are also shown.

Turning to FIG. 17, shown therein is a detail perspective view of the lower portion of the present invention. Additional track elements 62 can be added to the main track 14 to provide additional enclosure units by placing the edge of track element 62 into slot 52 located on the edge of the track base.

Turning to FIG. 18, shown therein is a sectional view of the lower portion of the present invention. The arches 12 are designed so that the transparent panel elements are fixedly positioned within the track 14 engaging frame 16 in a coplanar and 90-degree or perpendicular relationship. Thereby the entire width of the arch is supported by the track. Other elements previously disclosed are also shown.

Turning to FIG. 19, shown therein is a cross sectional view of the present invention. Shown are three enclosure units taken from FIG. 16 including the rectangular frame housing 16, transparent panel 22 and rubber gaskets or flap 60. The housing of frame 16 has a pair of horizontally opposed U-shaped receptacles 74 on its two sides and on its outer surface for receiving the edges of the panels 22. A slot or notch 76 is provided on the inner surface of frame housing 16 for receiving the flap 60.

Turning to FIG. 20, shown therein is a front view of track 14 and the plastic track cover plate 64 of the present invention. The unused portion of the track 14 and rail 46 can be covered over with a cover plate 64. The cover plate 64 smoothes off the top portion of the track 14 so as to prevent hurting one's feet when stepping on the track. A plastic track cover spacer 66 is also shown to provide additional support to the cover plate 64 and rails 46.

Turning to FIG. 21, shown therein is a detail view of the track 14 and bottom portion of the frame 16 of the present invention in a wind condition. The anchor plate 40 is attached to the lower portion of the frame 16 and secures the dome sections 12 to the track so the dome sections 12 can roll and hold simultaneously. This design provides a secured relationship between the track 14 and the dome section 12 and prevents the dome from leaving the track during a wind shown by arrows 68. Also shown are additional support hooks 70 and straps 72. Other elements previously disclosed are also shown.

I claim:

1. An apparatus for providing an enclosure for attachment to a building or for covering an area, comprising:

a) a plurality of arcuate panels, said panels having a first and second end, and a first and second side, wherein said panels are generally rectangular, planar panels;

b) a plurality of arcuate frame members, said frame members having a first and second end, and a first and second side for receiving said panels, and an inner and an outer surface;

c) a pair of end panels for attachment to the ends of the enclosure to complete the enclosure;

d) means-for a plurality of horizontal frame members whereby the ends of the arcuate frame members are secured;

e) means for a plurality of rollers disposed on said horizontal frame members whereby said horizontal frame members are movable thereon;

f) means for a plurality of horizontal rails whereby the rollers are rollable thereon and the rails are able to be attached to a foundation; and,

g) wherein said plurality of arcuate panels and said plurality of arcuate frame members are sized so that arcuate panels and arcuate frame members of smaller diameter are disposed toward the interior of said panels and frame members of larger diameter so that said panels and frame members are able to telescope one within each other, wherein said arcuate panels approximate the shape of one of a circumference of half a circle or one-fourth an ellipse and said end panels are generally flat and removable.

US 6,637,160 B2

11                                                                                   12

**2**. The apparatus of claim **1**, wherein said arcuate panels approximate the shape of the circumference of half an ellipse.

**3**. The apparatus of claim **1**, wherein said plurality of arcuate frame members further comprise a generally rectangular shaped housing having a pair of horizontally disposed U-shaped receptacles on said outer surface thereof for receiving said first and second sides of said arcuate panels and an inwardly extending flap disposed on said inner surface.

**4**. The apparatus of claim **3**, herein said rectangular shaped housing has a slot therein, said slot disposed on said inner surface thereof for receiving said flap.

**5**. The apparatus of claim **4**, herein said means for a plurality of horizontal frame members further comprise a downwardly disposed U-shaped frame having a plurality of rollers disposed internal said U-shaped frame, said rollers being used for contacting said means for a plurality of horizontal rails.

**6**. The apparatus of claim **5**, wherein said U-shaped frame further comprises a downwardly disposed anchor plate thereon for contacting the rails.

**7**. The apparatus of claim **6**, wherein said anchor plate further comprises a hook disposed on the lower end of said anchor plate.

**8**. The apparatus of claim **7**, wherein said U-shaped frame further comprising an upwardly disposed U-shaped receptacle thereon for receiving said first end of said arcuate panels.

**9**. The apparatus of claim **8**, said means for a plurality of horizontal rails further comprise a base plate upon which plate said rails are mounted and said rails are attached to a foundation.

**10**. The apparatus of claim **9**, wherein said rail has an enlarged, exposed edge for receiving said hook of said anchor plate so that said anchor plate is secured to said rail.

**11**. The apparatus of claim **10**, further comprising means for adding additional rails to said rail base plate whereby the number of rails varies.

**12**. The apparatus of claim **11**, wherein said means for adding additional rails further comprises a slot disposed in the edge of said base plate for receiving the edge of another base plate.

**13**. Then apparatus of claim **12**, further comprising a stop rod and an end plug disposed in the end of said rail.

**14**. The apparatus of claim **13**, further comprising a cover for being placed over the tops of said rails and a spacer for being placed between said rails to enable one to walk over said rails.

**15**. The apparatus of claim **4**, further comprising a plurality of hooks and straps for securing said arcuate panels to said arcuate frame members.

**16**. The apparatus of claim **15**, wherein said arcuate panels are transparent.

*   *   *   *   *

## **<u>PROOF OF SERVICE</u>**

I hereby certify that on this 11th day of April, 2014, the foregoing CORRECTED BRIEF OF PLAINTIFF-APPELLANT was electronically filed with the Court of Appeals for the Federal Circuit, using the CM/ECF system, which sent notification of such filing to the following:

Gregory J. Coffey
Richard J. Dewland
465 Street # 111
Morristown, New Jersey 07960-6439
Email: gjc@coffeylaw.com
Email: rjd@coffeylaw.com

H. Dickson Burton
Krista Weber Powell
TraskBritt, PC
230 South 500 East, Suite 300
Salt Lake City, Utah 84110
Email: hdburton@traskbritt.com
Email: kwpowell@traskbritt.com

## **CERTIFICATE OF COMPLIANCE**

I, Margaret L. Carlson, certify that this document was prepared using Microsoft Word. This Brief contains 10,858 words and 1,218 lines as permitted by Fed.R.App.P. 32(a)(7)(B) and Federal Circuit Rule 32(b).

The word count was established using the word count feature of Microsoft Word.

Margaret L. Carlson,
Legal Assistant for Todd E. Zenger